Jacob R. VALDEZ, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 97SC461.

Supreme Court of Colorado,
En Banc.

Sept. 21, 1998.

David F. Vela, Colorado State Public Defender, Elizabeth Griffin, Deputy State Public Defender, Denver, Colorado, Attorneys for Petitioner.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, John Daniel Dailey, Deputy Attorney General, Robert Mark Russel, First Assistant Attorney General, John J. Krause, Assistant Attorney General, Criminal Enforcement Section, Denver, Colorado, Attorneys for Respondent.

Chief Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *People v. Valdez*, 946 P.2d 491 (Colo.App.1997), upholding the trial court's determination that the defendant, Jacob R. Valdez (Valdez), failed to establish a prima facie showing of racial discrimination during the jury selection process.[1] We now reverse.

### I.

In February 1995, a jury convicted the defendant of theft from an at-risk adult,[2] attempted theft from an at-risk adult,[3] two counts of second degree burglary,[4] two counts of criminal impersonation,[5] and of being a habitual criminal.[6] The charges stemmed from two incidents in July of 1994 when three men who represented themselves as public service or water employees entered the homes of two elderly people, and then stole or attempted to steal items from the homes. As a result of the convictions, the Denver District Court (trial court) sentenced the defendant to thirty years in the Department of Corrections.

During the jury selection process, the trial court rejected the defendant's argument that

---

1. We granted certiorari on the following issues:

    1. Whether the court of appeals erred in holding that abuse of discretion is the standard of review on the prima facie showing issue in a *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), challenge.
    2. Whether the defendant made a prima facie showing under the facts of this case.
    3. Whether a defendant's burden of making a prima facie showing of intentional discrimination is rendered moot by the trial court's decision to first address the reasons for the challenged strikes.

2. See §§ 18–6.5–103 and 18–4–401, 6 C.R.S. (1997).

3. See §§ 18–2–101, 18–6.5–103, and 18–4–401, 6 C.R.S. (1997).

4. See § 18–4–203, 6 C.R.S. (1997).

5. See § 18–5–113, 6 C.R.S. (1997).

6. See § 16–13–101, 6 C.R.S. (1997). Although the jury found the defendant guilty of being a habitual offender, the trial court dismissed the habitual criminal counts for lack of proof.

the prosecutor used his peremptory strikes to remove potential jurors on account of their race. The court of appeals agreed with the trial court and affirmed the convictions, but remanded for correction of the mittimus. The defendant now raises his claim of racial discrimination in the jury selection process.

## II.

"A person's race simply is unrelated to his [or her] fitness as a juror." *See Batson v. Kentucky,* 476 U.S. 79, 87, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (citations omitted). In *Batson,* the United States Supreme Court affirmed a principle that was established well over a century ago: the Equal Protection Clause of the Fourteenth Amendment guarantees to the defendant that the state will not discriminate on account of race in the jury selection process. *See id.* at 85–86, 106 S.Ct. 1712 (citing *Strauder v. West Virginia,* 100 U.S. 303, 306–08, 25 L.Ed. 664 (1879)); *see also* Colo. Const. art. II, § 25. Additionally, the United States Supreme Court stated:

> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.

*See Batson,* 476 U.S. at 87, 106 S.Ct. 1712.

Subsequently, the United States Supreme Court expanded the reach of *Batson.*[7] As relevant to this case, the Supreme Court in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), held that the defendant need not be a member of a cognizable racial group capable of being singled out for differential treatment, and need not share the same racial identity with the excluded potential juror. *See id.* at 415–16, 111 S.Ct. 1364 (holding that while racial identity between the defendant and the excused person may be a factor in some cases, it is not a prerequisite for a defendant raising a *Batson* challenge). Here the defendant is Hispanic, and he claims discrimination in jury selection based on race, African American.

"*Batson* outlines a three-step process for evaluating claims of racial discrimination in jury selection under the Equal Protection Clause." *People v. Cerrone,* 854 P.2d 178, 185 (Colo.1993) (citing *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Batson,* 476 U.S. at 93–98, 106 S.Ct. 1712). The burden of persuasion is always on the party who alleges discrimination in jury selection. *See Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Cerrone,* 854 P.2d at 185.

In the type of case now before us, the first step of the *Batson* analysis requires that the defendant make a prima facie showing that the prosecution excluded a potential juror or jurors because of race. *See Cerrone,* 854 P.2d at 185. To establish a prima facie showing, the defendant: (1) must demonstrate that the prosecution struck from the jury a member of a cognizable racial group; (2) can rely on the fact that "peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate"; and (3) must show that the totality of the relevant facts gives rise to an inference of purposeful discrimination. *Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712. The trial court must consider all relevant circumstances in determining whether a prima facie case has been made. *See id.* at 96–97, 106 S.Ct. 1712.[8]

---

7. The *Batson* case involved a prosecutor's use of peremptory strikes in a criminal trial; but its principles now apply to gender-based discrimination, *see J.E.B. v. Alabama,* 511 U.S. 127, 146, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and to peremptory challenges by criminal defendants, *see Georgia v. McCollum,* 505 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), as well as those of private litigants in civil cases, *see Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 631, 111 S.Ct. 2077, 114 L.Ed.2d 660

(1991). Only a claim of race-based discrimination by the prosecution is at issue here.

8. In *Batson,* the United States Supreme Court described several possible ways in which a defendant could satisfy step one of the *Batson* test. Proof of systematic exclusion from the venire automatically raises an inference of a discriminatory motive. *See Batson,* 476 U.S. at 94, 106 S.Ct. 1712. The defendant also may make a prima facie case by relying solely on the facts concerning jury selection in his or her specific

The prima facie standard is not a high one; the defendant is not required to prove by a preponderance of the evidence that discrimination occurred. Rather, the defendant must present evidence sufficient to raise an inference that discrimination occurred. *See id.*

If the defendant establishes a prima facie case in step one of the *Batson* analysis, the burden of production shifts to the prosecution to come forward with a race-neutral explanation. *See Purkett*, 514 U.S. at 767, 115 S.Ct. 1769. The prosecution cannot satisfy its burden of production in step two by merely denying that the prosecutor had a racially discriminatory motive, *see Batson*, 476 U.S. at 94, 106 S.Ct. 1712, but the prosecution need not provide an explanation that is persuasive or even plausible, so long as the reason is facially race-neutral. *See Purkett*, 514 U.S. at 768–69, 115 S.Ct. 1769 (holding that proffered explanation of strike due to long, unkempt hair, a mustache, and a beard of the potential juror satisfied step two of *Batson* analysis). Again, the burden in step two is not high. The prosecution need only proffer a racially-neutral explanation for its action.

If the race-neutral reason is tendered, then the trial court moves on to the third and final step in which it must determine whether the opponent of the strike has proven purposeful racial discrimination. *See Batson*, 476 U.S. at 98, 106 S.Ct. 1712. The defendant must have the opportunity to rebut the prosecution's race-neutral explanation by showing, for example, that it is pretext. *See Cerrone*, 854 P.2d at 191 n. 22; *People v. Mendoza*, 876 P.2d 98, 101–02 (Colo.App.1994). The court then must determine the merits of the *Batson* challenge on the basis of all the evidence before it. The question is whether the court can find by a preponderance of the evidence that one or more potential jurors were excluded because of race. *See Cerrone*, 854 P.2d at 191.

The standard of review we apply on appeal depends upon which step of the *Batson* analysis is before us.[9] It is well settled that the trial court's determination in the third step of the *Batson* analysis of actual racial discrimination is an issue of fact to which we afford due deference and review only for clear error. *See Hernandez*, 500 U.S. at 364, 111 S.Ct. 1859; *Cerrone*, 854 P.2d at 191. However, we apply a de novo standard when reviewing the second step of the *Batson* analysis. The issue in the second step is the facial validity of the reason articulated by the prosecution, *see Purkett*, 514 U.S. at 768, 115 S.Ct. 1769, which is a question of law warranting de novo review, *see Hurd v. Pittsburg State Univ.*, 109 F.3d 1540, 1546 (10th Cir.1997); *United States v. Sneed*, 34 F.3d 1570, 1580 (10th Cir.1994).

This court has not previously considered the appropriate standard of review applicable to the prima facie showing in the first step of the *Batson* analysis. Traditionally, judicial determinations are divided into three categories for the purposes of the standard of review: (1) questions of law which are reviewable de novo; (2) questions of fact which are reviewable for clear error; and (3) matters of discretion which are reviewable for abuse of discretion. *See Pierce v. Underwood*, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). The court of appeals stated that the standard of review on a prima

case. *See id.* at 95, 106 S.Ct. 1712. Factors which the court should consider that could raise or lend support to an inference of purposeful discrimination include a pattern of strikes against potential jurors who are members of a particular cognizable racial group or the prosecutor's questions and statements during voir dire examination and in exercising his challenges. *See id.* at 96–97, 106 S.Ct. 1712.

9. The People, in their brief, argue that because the defendant did not present this claim of standard of review to the court of appeals in his briefs or petition for rehearing, we should not address this issue. While we do not address

issues that are not properly preserved for review, *see Gorman v. Tucker*, 961 P.2d 1126, 1131 (Colo. 1998), we must determine the standard of review in this case in order to address the underlying issues regarding the *Batson* determination. *See Pierce v. Underwood*, 487 U.S. 552, 557–58, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (determining the proper standard of review before addressing the underlying substantive issue). In fact, during oral argument, the attorney for the People conceded the necessity of determining the standard of review in order to reach the issue of whether a prima facie case under *Batson* had been established.

facie showing is abuse of discretion and cited *People v. Gardenhire*, 903 P.2d 1159 (Colo. App.1995), as well as numerous federal and out-of-state cases to support this proposition. Indeed, the court of appeals in *Gardenhire* and *People v. Hughes*, 946 P.2d 509 (Colo. App.1997), and a number of federal courts of appeal have afforded great deference to the trial court's resolution of whether or not a defendant established a prima facie showing of discrimination under *Batson.*[10] *See Gardenhire*, 903 P.2d at 1164; *Hughes*, 946 P.2d at 518; *United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir.1994); *United States v. Vasquez–Lopez*, 22 F.3d 900, 901 (9th Cir.1994); *United States v. Moore*, 895 F.2d 484, 485–86 (8th Cir.1990).

Conversely, a different panel of the court of appeals in *People v. Portley*, 857 P.2d 459, 463 (Colo.App.1992), explicitly rejected the abuse of discretion standard of review as to the initial step of the *Batson* inquiry. Moreover, the Tenth Circuit, as well as numerous out-of-state courts, has applied a de novo standard of review to the prima facie determination of the *Batson* analysis. *See, e.g., United States v. Hartsfield*, 976 F.2d 1349, 1355–56 (10th Cir.1992); *State v. Sledd*, 250 Kan. 15, 825 P.2d 114, 119 (Kan.1992); *State v. Butler*, 795 S.W.2d 680, 687 (Tenn.Crim. App.1990); *State v. Pharris*, 846 P.2d 454, 459 (Utah Ct.App.1993).

In considering the proper standard of review, we seek guidance from Title VII cases. *See Sledd*, 825 P.2d at 119 (citing *Butler*, 795 S.W.2d at 687, and referring to Title VII in determining that the court had plenary review over whether a prima facie case under *Batson* had been established); *see also* 42 U.S.C. § 2000e (1994); *Batson*, 476 U.S. at 94 n. 18, 106 S.Ct. 1712 ("Our decisions concerning 'disparate treatment' under Title VII of the Civil Rights Act of 1964 have explained the operation of prima facie burden of proof rules."). Appropriately, the standard for a Title VII prima facie showing (i.e., whether the plaintiff raises an inference of illegal discrimination under *McDonnell Douglas* ), *see Furnco Constr. Corp. v. Waters*, 438

U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), is similar to the prima facie standard under *Batson*.

In *Furnco*, the United States Supreme Court indicated that whether a plaintiff has made a Title VII prima facie showing is a matter of law. *See Furnco*, 438 U.S. at 575, 579, 98 S.Ct. 2943. Subsequently, some federal courts have applied a de novo standard of review to the trial court's prima facie determination under Title VII. *See Hill v. Metropolitan Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1538 (11th Cir.1988) (applying a de novo standard of review to cases dismissed for failure to make a prima facie case); *Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 543 n. 10, 546 (9th Cir.1982). In *Gay*, the court articulated that the clearly erroneous standard of review should not be applied to a prima facie case under *McDonnell Douglas* because the dispositive question is a legal inquiry. *Gay*, 694 F.2d at 543 n. 10.

■ Therefore, although we afford deference to the trial court's ultimate determination of a *Batson* challenge in step three, we believe that the first step involves a question of legal sufficiency over which the appellate court must have plenary review. We continue to defer to the underlying factual findings, including any predicate credibility determinations of the trial court upon which its prima facie determination under *Batson* is based. However, we hold that the question of whether the defendant has established a prima facie case under *Batson* is a matter of law, and we apply a de novo standard of review to a trial court's prima facie determination of the *Batson* analysis. Thus, we reject the court of appeals' conclusion that the appropriate standard of review as to a prima facie case under *Batson* is whether the trial court abused its discretion. To the extent *Gardenhire* and *Hughes* conflict with our determination that the standard of review for a prima facie showing under *Batson* is de novo, we overrule them.

*United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir.1994); *United States v. Vasquez–Lopez*, 22 F.3d 900, 901 (9th Cir.1994); *United States v. Moore*, 895 F.2d 484, 485–86 (8th Cir.1990).

---

**10.** The court of appeals in this case applied an abuse of discretion standard to the first step of the *Batson* analysis. However, the federal courts it cites use a clear error standard of review. *See*

### III.

The defendant argues that the issue of whether a prima facie case under *Batson* was established is moot, and that the trial court should have completed the third step of the *Batson* analysis because the trial court completed step two under *Batson* by providing possible reasons for the prosecutor's peremptory strikes. The following conversation during jury selection occurred between the trial court and defense counsel:

[DEFENSE COUNSEL]: —on the *Batson* issue. Judge, I think that if the Court would go down and take a look at the bumps that the prosecutor used, I think he used five bumps. Three of them were to black people.... With regard to [Mr. P], there was nothing that I heard in any response that [Mr. P] gave that would be a legitimate, nondiscriminatory reason for booting him off of this jury.... There is a pattern that exists: five challenges exercised, three challenges made to African Americans,

....

[TRIAL COURT]: The Court is going to find, based upon [Mr. P's] questionnaire, that he does have a family member who has been convicted of a crime in the past ten years. I believe he is one of the few if not the only juror who answered that "yes" on his questionnaire.

Further, with regard to [Ms. M], she was doing nothing but trying to get off this jury in response to questions from me, the prosecutor and the defense attorney. She as much as said she wouldn't pay attention because she'd be worried about her work, so I'm not sure that this is a fair person to look at in terms of it being a pattern.

The Court is going to find, pursuant to the case law, that the defense has not made a proper prima facie showing. I will make that finding as well because [Mr. B], who was excused, was replaced by a black woman, and [Mr. T], who was one of the final jurors seated, is a black man. Also, [Ms. L], who remains, is a black woman, and I believe [Ms. B] is the other black member of the—or African-American member of the jury panel. I think there are four African-Americans who remain on the jury, notwithstanding the People's challenges.

Just because I think it is probably the safest way in which to proceed, [prosecutor], I will ask you if you wish to make a record as to why you excused [Mr. P], notwithstanding my failure to find a prima facie case shown by the Defense.

[PROSECUTOR]: Although I don't have to, Your Honor, and in most cases I probably would not, but just to make a record, I believe [Mr. P] was one of the individuals who indicated that he did have a family member who had been convicted, and I have that highlighted on the questionnaire, which was a concern. I asked him about it. His answer was not a quick answer, "No, I can be fair." he said, "Um, well," and he was hesitant, even when I asked him regarding that particular question. To me, that was an indication that it appeared that maybe there was something there. He did say and give the proper answer, that he thought he could be fair, but he appeared hesitant, and it was one of the matters that I highlighted with respect to [Mr. P].

[TRIAL COURT]: Thank you. I think the record on that is complete. You can excuse [Mr. P].

■ As a general matter, once the proponent of the challenged peremptory strike offers a race-neutral explanation for the peremptory challenge (i.e., the second step of *Batson*) and the trial court has ruled on the ultimate question of intentional discrimination (i.e., the third step of *Batson*), the preliminary issue of whether the defendant has made a prima facie showing becomes moot. *See Cerrone*, 854 P.2d at 186 n. 13 (citing *Hernandez*, 500 U.S. at 359, 111 S.Ct. 1859 (plurality opinion)).

■ For purposes of our review, the defendant's argument that the prima facie issue under *Batson* is moot has no merit. Although the trial court improperly offered its own plausible reasons for the prosecutor's strikes,[11] the trial court never reached steps

---

11. The trial court in this case sua sponte offered its own plausible reasons behind the peremptory

two or three of the *Batson* analysis. Its ruling was limited to the prima facie issue. Thus, the prima facie issue under *Batson* is not moot, and applying a de novo standard of review, we must determine whether the defendant established a prima facie case under *Batson.*

## IV.

Having ruled that the prima facie issue is not moot, we now turn to the defendant's argument that the trial court erred by ruling that he did not establish a prima facie case of purposeful discrimination under *Batson.*[12] We agree.

At trial, the defendant contended that the prosecutor's use of his peremptory challenges exhibited a pattern of racial discrimination and that one potential African–American juror, Mr. P, was struck because of his race. The defendant asserts that after the venire was passed for cause, there were seven African Americans in a venire of twenty-six (27%), and the prosecutor used three of his five challenges (60%) to eliminate potential African–American jurors. He contends that the prosecutor's use of 60% of his challenges against a cognizable group that only composed 27% of the venire is a pattern sufficient to raise an inference of discrimination.

It is well-established that African Americans constitute a cognizable racial group under *Batson. See Batson,* 476 U.S. at 100, 106 S.Ct. 1712. Additionally, a party objecting to

a peremptory challenge can use statistical evidence to substantiate a prima facie case under *Batson. See Cerrone,* 854 P.2d at 189. However, "there is no magic number of challenged jurors which shifts the burden to the government to provide a neutral explanation for its actions." *Turner v. Marshall,* 63 F.3d 807, 812 (9th Cir.1995) (quoting *United States v. Chinchilla,* 874 F.2d 695, 698 (9th Cir.1989)).

Other courts have looked to statistics in determining whether a prima facie case under *Batson* is established. In *Turner,* 63 F.3d at 812–13, the court found a prima facie case under *Batson* when the prosecutor exercised 56% (five of nine) of his or her challenges against African Americans which composed approximately 30% of the venire. *See also United States v. Alvarado,* 923 F.2d 253, 255–56 (2d Cir.1991) (finding a *Batson* prima facie case when prosecutor had a challenge rate against members of a minority, which constituted 29% of the venire, of over 50%). We agree that the statistics in this case indicate a pattern of strikes against African Americans disproportionate to the percentage of African Americans in the venire; however, there are other factors we must consider.[13]

While the prosecutor did use three of his five challenges exercised to strike potential jurors who were African American, the prosecutor did not exercise all of his seven peremptory challenges.[14] Moreover, as the trial court noted, the defendant's theory of a dis-

strikes at issue. This was improper. It is the responsibility of the prosecution to provide its reasons supporting its peremptory strikes at step two of the *Batson* analysis, after the trial court rules that an inference of discrimination exists. However, we disagree with the defendant's argument that this error equated to a completion of step two of the *Batson* analysis. The trial court explicitly limited its ruling to the prima facie determination, and the prosecutor only offered his reasons *after* that determination.

**12.** We do not address whether the defendant's right to a trial by an impartial jury under the Sixth Amendment to the United States Constitution and article II, section 16, of the Colorado Constitution has been violated because this issue is not properly before us. *See Fields v. People,* 732 P.2d 1145, 1151 (Colo.1987) (addressing right to trial by an impartial jury, but refusing to

address equal protection question because the issue was not raised in defendant's petition for certiorari).

**13.** Courts must be wary of relying on only statistics in cases where the numbers utilized are relatively small and the results may be statistically insignificant. *See Aldridge v. State,* 258 Ga. 75, 365 S.E.2d 111, 114 (Ga.1988) ("Deciding cases through the use of raw numbers carries with it inherent dangers and possibilities of illogical or unjust results.").

**14.** We note that the prosecutor chose not to use his final two peremptory challenges after the defendant initially objected to the striking of Mr. P. However, the trial court postponed its *Batson* analysis until after the prosecutor declined to use his final two peremptory challenges and accepted the jury.

criminatory pattern is further weakened by the fact that one of the potential African–American jurors excused by the prosecutor was replaced by another African American. This is an important consideration under the jury selection method used in this case because the prosecutor knew which potential juror would replace a potential juror whom he struck. The final jury consisted of four African Americans, a factor that is particularly significant in light of the prosecution's decision not to exercise all of its peremptory challenges. *Compare United States v. Grandison,* 885 F.2d 143, 147 (4th Cir.1989) (stating that the fact that proponent of the strike did not use available strikes against African Americans who served on final jury is significant in prima facie analysis under *Batson*) *and People v. Saiz,* 923 P.2d 197, 206 (Colo. App.1995) (holding that no prima facie case under *Batson* existed where six individuals with Spanish surnames were on the final jury) *with Turner,* 63 F.3d at 813 (stating trial judge may have impermissibly relied on fact that African Americans and members of other minorities remained on jury, without considering other factors) *and People v. Baker,* 924 P.2d 1186, 1189 (Colo.App.1996) (holding that use of peremptory challenge to strike the only venire member of a cognizable racial group establishes a prima facie case under *Batson*). Finally, the defendant failed to provide any evidence to the trial court which supported his theory that Mr. P. was only excused because of his race.[15]

To supplement his prima facie argument under *Batson,* however, the defendant now advances two arguments. First, he contends that the prosecutor discriminately struck Mr. P while not striking Mr. D, a similarly-situated white juror.[16] Second, he contends that the prosecutor improperly injected the issue of race into the voir dire by his statements during the beginning of voir dire. Neither argument was raised in the trial court and

the question is whether either should be considered by this court.

■ The burden of persuasion is always on the defendant to present evidence of purposeful discrimination to the trial court under *Batson. See Purkett,* 514 U.S. at 768, 115 S.Ct. 1769; *Cerrone,* 854 P.2d at 185. Turning to the first argument, the transcript indicates that Mr. D was part of the pool of thirty-four potential jurors. Originally, he was not one of the first twelve jurors and two alternates, but he moved into the rank of the twelve when another juror was removed by the exercise of a peremptory strike by the prosecution. Mr. D was seated before Mr. P was peremptorily challenged by the prosecutor. After Mr. P was stricken, both the prosecutor and the defense accepted Mr. D and he served on the jury.

After Mr. D was accepted by the prosecution, the defendant could have asserted that Mr. D was similarly situated to Mr. P and the prosecution's acceptance of Mr. D was evidence of racial discrimination. However, the defendant did not make the claim that the two potential jurors were similarly situated. Had he done so, that claim then could have been tested and determined as a factual matter by the trial court. As the record stands, we have no such determination. We cannot be finders of fact. Nor can we demand that, in every *Batson* challenge, the trial court must compare the struck juror(s) to all of the other potential jurors in order to determine if any of the other potential jurors were similarly situated to the struck juror(s). It was incumbent on the defense counsel to raise this argument to the trial court. If it was not apparent to the defense counsel that Mr. D was similarly situated to Mr. P, it is unreasonable to expect that the trial court should have noted the comparison on its own.

■ However, we do address the issue of the prosecutor's opening remarks during voir dire. While the defendant has the

---

**15.** We note that in close cases where the answer to whether racial discrimination existed in jury selection is not easily discernable, the better policy would be for the trial court to complete the *Batson* analysis.

**16.** The defendant contends that both male jurors had similar educational backgrounds and prior

military service, were approximately the same age, were both victims of car thefts, had never served on a jury before nor been a witness, and both either were convicted or had a family member convicted of a crime within the past ten years.

burden of presenting evidence of discrimination in a *Batson* challenge, *Batson* itself mandates that "the trial court should consider all relevant circumstances" and specifically refers to "the prosecutor's questions and statements during voir dire examination." *See Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712.[17] Unlike the characteristics of all of the potential jurors, the prosecutor's remarks are obvious to the trial judge because they are made before the trial judge in the context of jury selection. Here, the trial court heard and even interrupted the prosecutor's opening remarks in order to admonish the prosecutor for referencing the O.J. Simpson case during his opening statement. Thus, because these remarks were obvious to the trial court and relevant to the *Batson* analysis, the trial court should have considered the prosecutor's opening remarks in its *Batson* determination, and we will address the defendant's argument that these remarks helped establish a prima facie case under *Batson*. *See Turner*, 63 F.3d at 814 (noting that the trial court failed to consider the prosecutor's questions and statements during voir dire in reversing the trial court's denial of the defendant's *Batson* challenge).

The prosecutor's statements during the beginning of voir dire were as follows:

[PROSECUTOR:] Everybody has a different life experience. We have different cultures.... One of the principal issues that you hear quite a bit about, and you probably have heard about it since some of you may be listening to the O.J. Simpson case—

[TRIAL COURT:] I told you you couldn't talk about that in here, [prosecutor].

[PROSECUTOR:] I'm not going to discuss the O.J. Simpson case, but one of the issues that sometimes does come up in a courtroom is whether or not an individual can be fair and impartial regarding perhaps the race of a person, either the accused, the prosecutor or defense attorney, or anything of that nature. Really the racial issue in your deliberations is not something that you have to consider.... We're only going to ask you to be fair and impartial, but if there is in your background something that you really feel that—in this case, the defendant happens to be Hispanic, the prosecutor is Hispanic ... the defense counsel, is black. If there's something racial, just be candid with us. If you don't feel you can be fair because of that particular issue, let us know. Just be candid with us, because, you know, life outside is not a sterile environment.

This case did not have any apparent racial issues.[18] The prosecutor's statements show his own concern with the racial composition of the jury, the defendant, and the two counsel. Furthermore, his remarks about different cultures, references to the O.J. Simpson case, and concerns about people's backgrounds with regard to race suggest a fear that a certain cognizable racial group of jurors would be unable to be impartial, an assumption forbidden by the Equal Protection Clause. *See Batson*, 476 U.S. at 89, 106 S.Ct. 1712. In fact, the trial judge noted that reference to the O.J. Simpson murder trial was inappropriate in this case.[19] The

---

17. The *Batson* court cited this example as "merely illustrative" of the relevant circumstances that the trial court should consider. *See Batson*, 476 U.S. at 97, 106 S.Ct. 1712. The Third Circuit has incorporated this factor as one of a five-factor test it uses to determine whether a defendant has presented a prima facie case under *Batson*. The five factors are:

1) how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen;
2) the nature of the crime;
3) the race of the defendant and the victim;
4) the pattern of strikes against racial group jurors in the particular venire;
5) the prosecutor's statements and questions during selection.

*See Deputy v. Taylor*, 19 F.3d 1485, 1492 (3d Cir.1994). We see no reason to endorse a factors test because the applicable test for a prima facie showing under *Batson* is one of the totality of the circumstances. *See Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712. The factors enumerated by the Third Circuit are certainly relevant but are not necessarily dispositive.

18. The defendant is Hispanic; however, the racial or ethnic identity of the two victims is not part of the record. Although the victims do not have Spanish surnames, we are unable to say more about their identity.

19. Jury selection in this case occurred on February 7, 1995, and references to the highly publi-

prosecution's implicit and explicit references to racial bias during voir dire certainly support the defendant's argument that he established a prima facie case under *Batson.*

The *Batson* analysis replaced the crippling burden placed on the defendant in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), under which a defendant was required to prove a pattern of discrimination in jury composition. *See Batson* 476 U.S. at 92–93, 95, 106 S.Ct. 1712 (holding that a defendant can rely solely on the facts of his case in making a *Batson* challenge).[20] While the defendant has a burden of proving the existence of an inference of discrimination in order to establish a prima facie case under *Batson,* this burden, as discussed above, is not an onerous one. *See Bergodere,* 40 F.3d at 516; *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (stating that the burden of establishing a prima facie case of disparate treatment under Title VII is not onerous).

■ We hold that the prosecutor's statements, when combined with his pattern of peremptory strikes, establish a prima facie case under *Batson.* We note that the prosecutor's opening statements may very well have been an attempt to prevent possible racial bias of the potential members of the jury, rather than an indication of his own racial bias. However, this factual determination of whether the prosecutor purposefully discriminated during jury selection should have been determined by the trial court in the third and ultimate step of the *Batson* analysis. *See Batson,* 476 U.S. at 98, 106 S.Ct. 1712.

### V.

For these reasons, we hold that the court of appeals erred in affirming the trial court's

determination that the defendant failed to establish a prima facie case of racial discrimination in the jury selection process under *Batson.* We reverse the judgment of the court of appeals and return this case to it. We direct that the case be remanded to the trial court to proceed with steps two and three of the *Batson* analysis. If the court on remand is unable to make these determinations based on the record and whatever additional evidence is presented, the court is directed to conduct a new trial.

Justice SCOTT concurs. Justice KOURLIS dissents, and Justice HOBBS and Justice RICE join in the dissent.

Justice SCOTT, concurring:

I join in its entirety Chief Justice Mullarkey's well-reasoned opinion for the majority of our court. I write separately only to set forth two considerations, one a view of current reality and the other of legal consequence. For the first, I borrow from Justices Clarence Thomas and Thurgood Marshall. Justice Thomas aptly noted: "The public, in general, continues to believe that the makeup of juries can matter in certain instances.... Common experience and common sense confirm this understanding." *Georgia v. McCollum,* 505 U.S. 42, 61, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (Thomas, J., concurring). Justice Marshall observed that "Justice Powell's eloquent opinion [in *Batson v. Kentucky* ] ... ably demonstrates the inadequacy of any burden of proof for racially discriminatory use of peremptories that requires that 'justice ... sit supinely by' and be flouted ... before a remedy is available." *Batson v. Kentucky,* 476 U.S. 79, 102, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (Marshall, J., concur-

---

cized O.J. Simpson case no doubt implicated concerns regarding racial bias. While the issue of race and jury bias came to the forefront of the press after O.J. Simpson, an African American, was acquitted in October 1995 of charges he murdered his ex-wife and her friend, who were both white, *see* Christo Lassiter, *The O.J. Simpson Verdict: A Lesson in Black and White,* 1 Mich. J. Race & L 69, 78–79 (1996), the makeup of the jury which was selected on December 8, 1994, was the subject of intense discussion in the

media, *see The World Almanac and Book of Facts 1996,* at 45 (Robert Famighetti, et al. eds., 1996).

**20.** The *Batson* court explained that many lower courts following *Swain* reasoned that in order to establish a violation of the Equal Protection Clause in jury selection, it was necessary to provide proof of repeated strikes to African Americans over a number of cases. *See Batson,* 476 U.S. at 92, 106 S.Ct. 1712.

ring). Thus, "[i]t is ... of paramount importance that [each segment of our] community believes we guarantee even-handed entry into our criminal justice system by way of the jury panel ... and not merely through the jailhouse door." *People v. Cerrone*, 854 P.2d 178, 196 (Colo.1993) (Scott, J., dissenting). This is especially true when we recognize that "[j]ury selection and final juror composition have so frequently been the objects of claims based on unfair bias in the administration of justice that it confirms the importance many of our citizens place on jury composition." *Id.* at 195. (These words were written before, but clearly confirmed by, our collective national experience in the O.J. Simpson case). While I certainly acknowledge that the dissent's rationale is sound, I believe its clearly erroneous standard, raising the bar for assertions of discriminatory peremptory challenges against the state, assumes too much and, more importantly, constructs a barrier to the full equal protection intended by the *Batson* Court.[1]

Second, I reiterate that the first step in *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712, requires only that the defendant make a prima facie showing to the trial court of purposeful race-based discrimination in jury selection. A prima facie case is one that "will prevail until contradicted and overcome by other evidence, ... the type of case to get [the movant] past a motion for directed verdict ... or motion to dismiss," or one in which the "evidence compels ... a [particular] conclusion if the [other party] produces no evidence to rebut it." *Black's Law Dictionary* 1190–91 (6th ed.1990); *see also,* Charles R. Calleros, *Title VII and the First Amendment: Content–Neutral Regulation, Disparate Impact, and the "Reasonable Person"*, 58 Ohio St. L.J. 1217, 1278–79 (1997) (opining that "a trial judge's ultimate deter-

mination, whether a plaintiff has established a prima facie case [under Title VII] ... should be freely reviewable as a mixed question of law and fact because it often requires the application of technical legal standards to the findings of historical fact"). Therefore, in my view, the better standard of review is that applied to a mixed question of law and fact, not one fashioned to apply to a trial court's factual determinations—as we in no way reject any of the factual findings of the trial court in this case.

Moreover, the cases relied upon by the dissent are unpersuasive. The Third and Fourth Circuits, for example, appear to base their conclusion, that the correct standard of review is for clear error, on a footnote in *Batson* which states:

> In a recent Title VII sex discrimination case, we stated that "a finding of intentional discrimination is a finding of fact" entitled to appropriate deference by a reviewing court. Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.

*Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712 (citation omitted).

That footnote, however, clearly is appended to the Court's elucidation of the third step, indicating that deference to the trial court is appropriate in the context of the ultimate determination of whether purposeful discrimination occurred. *See Hernandez v. New York*, 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) ("In *Batson*, we explained that the trial court's decision on the *ultimate question of discriminatory intent* represents a finding of fact of the sort accorded great deference on appeal ....") (emphasis added) (citing *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712).

---

**1.** We have been properly advised against straying from the plain purpose of *Strauder v. West Virginia*, 100 U.S. 303, 309, 25 L.Ed. 664 (1880) ("It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy."). While acknowledging the constraints of precedent, Justice Thomas shed

light on the consequences of tinkering with sound, longstanding protections originally extended only to criminal defendants in order to develop some legal precepts: "[B]lack criminal defendants will rue the day that [the Supreme] Court ventured down this road [by restricting a criminal defendant's use of such challenges] that inexorably will lead to the elimination of the peremptory strikes." *McCollum*, 505 U.S. at 60, 112 S.Ct. 2348.

In addition, the First, Fifth and Eleventh Circuits relied, at least in part, upon an Eighth Circuit decision, *United States v. Moore,* 895 F.2d 484 (8th Cir.1990), which did not cite any case law for the conclusion that the standard of review for the first step is clear error. *Moore* relied on *Batson* for its conclusion that the determination of a prima facie case is a question of fact. *Moore's* reasoning was based on the notion that the defendant must show a variety of facts to establish a prima facie case, such as that he or she is a member of a cognizable racial group and that the prosecutor exercised the peremptory challenges to remove venire members based on race. The required showing, however, is not comprised merely of facts, but of all relevant circumstances and, more importantly, a determination of whether those circumstances comprise an "inference that the prosecutor used that practice to exclude the veniremen ... on account of their race." *Batson,* 476 U.S. at 96, 106 S.Ct. 1712. It is this conclusion—the existence or nonexistence of the inference—that is reviewed under the first prong of *Batson,* not the underlying factual determinations of the trial court.

While required today less frequently than yesterday, appellate review of a trial court's application of *Batson* standards to peremptory strikes by the state should permit scrutiny that will avoid racial discrimination in the state's participation in jury selection. Accordingly, I join the majority in its opinion and its judgment.

Justice KOURLIS, dissenting:

Because I would adopt a clear error standard of review that would give deference to the trial judge's decision regarding the existence or non-existence of a prima facie case of discriminatory jury selection, I respectfully dissent. Applying that standard to this case, I would conclude that the trial court did not commit clear error in finding that the defendant failed to make out a prima facie showing under *Batson,* and I would therefore affirm the court of appeals.

1. *See Holl v. Commissioner,* 54 F.3d 648, 650

I.

Defining and adopting a standard of review is a critical part of the appellate function. Absent statutory directive or rulemaking, the standard is an outgrowth of the nature of the decision being reviewed— namely, whether it is a decision characterized by findings of fact or whether it is a conclusion of law.

Findings of fact are generally reviewed under a clear error or abuse of discretion standard, whereas conclusions of law are generally reviewed under a de novo standard. The reasons are straightforward. De novo means "anew; afresh; a second time." *Black's Law Dictionary* 392 (5th ed.1979). Indeed, appellate courts can and should review anew the question of whether a trial court reached the correct conclusion of law, or the right of appeal would be essentially meaningless. On the other hand, the appellate courts defer to the factual findings of the trial court because the trial judge is in the courtroom, and is charged with the duty to find facts. Appellate courts may not undertake fact-finding.

The tension arises between these two types of review when the issue before the appellate court is a mixed question of fact and law. Under those circumstances, the court may take a number of different approaches.[1] The court may treat the ultimate conclusion as one of fact for purposes of review and apply the clear error standard. *See, e.g., Rascon v. U.S. West Communications, Inc.,* 143 F.3d 1324, 1333 (10th Cir. 1998); *Holl,* 54 F.3d at 648; *Doss v. Doss,* 77 Colo. 262, 266, 236 P. 129, 131 (1925). Alternatively, the court may conclude that a mixed question of fact and law demands de novo review. *See, e.g., Lewis v. Colorado Rockies Baseball Club, Ltd.,* 941 P.2d 266, 271 (Colo. 1997). Lastly, the court may review the findings of fact for clear error and still look de novo at the legal conclusions that the trial court drew from those factual findings. *See, e.g., People v. Smith,* 926 P.2d 186, 188 (Colo. App.1996).

(10th Cir.1995).

## II.

With that background in mind, I turn to the issues before us in this case. The procedures set out by the United States Supreme Court in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), protect a defendant against the exercise of peremptory challenges by the prosecutor in a manner that violates the Equal Protection Clause.[2] For purposes of this discussion, the offending challenges are those that are racially motivated.

The three-part test adopted in *Batson* both instructs and empowers the trial judge to safeguard the neutrality of the process by which peremptory challenges are exercised. In step one, the defendant must make a prima facie showing to the trial court of purposeful race-based discrimination in jury selection. Specifically, the defendant bears the burden of showing that (1) the prosecution struck from the jury a member of a cognizable racial group and (2) the totality of the relevant facts and circumstances give rise to an inference of purposeful discrimination. *See Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712. The trial court must determine at step one whether the defendant has succeeded in establishing such a prima facie case. Second, the burden shifts to the prosecution to state a race-neutral explanation for the challenge. The reasons need not be persuasive, and the trial court must accept the reasons as true. Only if the prosecutor's discriminatory intent is apparent in the explanation will the court cut off the process and grant the *Batson* request. *See Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Third, the defendant has the opportunity to rebut the prosecutor's race-neutral explanations, showing them to be mere pretext used to obscure discrimination, and then the trial court rules on *Batson* objection. *Batson* is grounded in the assumption that the trial judge presiding in the courtroom is in the best position to guard against discrimination. Indeed, the Supreme Court stated that "[w]e have confidence that the trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case." *Batson,* 476 U.S. at 97, 106 S.Ct. 1712.

Discrimination is as sly as it is insidious. It lives in inference, tone, and gesture as much as in action. The trial judge is the judicial officer who watches and listens as voir dire unfolds, and who can discern the presence or absence of discriminatory intent. Indeed, whether a prima facie case of discriminatory exercise of peremptory challenges exists is a question of fact, or, at the very least, "fact-intensive." *United States v. Moore,* 895 F.2d 484, 485 (8th Cir.1990).

The Supreme Court has defined the standard of review governing the trial court's ultimate determination of whether the peremptory challenge was motivated by discriminatory intent as clear error. The Court states that treating "intent to discriminate as a pure issue of fact, subject to review with a deferential standard, accords with our treatment of that issue in other equal protection cases." *Hernandez v. New York,* 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Hence, only if the appellate court is convinced that the trial court's conclusion was clearly erroneous will it overturn the decision. *Id.* In reaching that conclusion, the Court rejected a mixed law and fact approach:

> Petitioner advocates "independent" appellate review of a trial court's rejection of a *Batson* claim. We have difficulty understanding the nature of the review petitioner would have us conduct. Petitioner explains that "independent review requires the appellate court to accept the findings of historical fact and credibility of the lower court unless they are clearly erroneous. Then based on these facts, the appellate court independently determines whether there has been discrimination." But if an appellate court accepts a trial court's find-

---

2. Subsequent case law has clarified that not only does the defendant have the right to challenge any prosecutorial efforts to select the jury on racial grounds, but the prosecutor has the same right to object to the defendant's challenges. *See*

*Georgia v. McCollum,* 505 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Further, jurors themselves have a right to serve without being removed for discriminatory reasons. *Id.* at 48, 112 S.Ct. 2348.

ing that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination.

*Id.* at 366–67, 111 S.Ct. 1859 (citation omitted).

Later, in *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), the Court addressed a circumstance in which a defendant raised a *Batson* challenge to which the prosecution offered a race-neutral explanation relating to the challenged juror's hair length and facial hair. The trial court overruled the defendant's *Batson* objection. On habeas corpus appeal, the Court of Appeals for the Eighth Circuit reversed and remanded on the basis that the factors articulated by the prosecution were pretextual and not legitimate. The Supreme Court reversed the court of appeals, holding that the race-neutral explanation need not be related to the specific case or even legitimate. The Court clarified that the credibility determination was a factor to be taken into account at the third stage of the *Batson* analysis, not at the second stage where even an implausible or fantastic reason would serve to shift the burden of persuasion back to the opponent of the strike.[3] The Court reaffirmed that the ultimate determination of racial motive was a finding of fact presumed to be correct only if not fairly supported by the record.

Hence, the two themes of the Supreme Court pronouncements in the *Batson* context are that discrimination is principally an issue of fact, and that deference to the trial court is therefore appropriate.

For all of these reasons, in my view, the appropriate standard of review for appellate oversight of a trial court's determination of a prima facie case is clear error. In reaching

that conclusion, I subscribe to the reasoning of numerous other courts that have addressed the issue. *See, e.g., United States v. Stewart,* 65 F.3d 918 (11th Cir.1995), *cert. denied sub nom. Daniel v. United States,* 516 U.S. 1134, 116 S.Ct. 958, 133 L.Ed.2d 881 (1996); *United States v. Bergodere,* 40 F.3d 512, 516 (1st Cir.1994), *cert. denied,* 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995); *United States v. Vasquez–Lopez,* 22 F.3d 900 (9th Cir.1994), *cert. denied,* 513 U.S. 891, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994); *United States v. Branch,* 989 F.2d 752 (5th Cir.), *cert. denied sub nom. Thompson v. United States,* 509 U.S. 931, 113 S.Ct. 3060, 125 L.Ed.2d 742 (1993); *United States v. Casper,* 956 F.2d 416 (3d Cir.1992); *United States v. Moore,* 895 F.2d 484 (8th Cir.1990); and *United States v. Grandison,* 885 F.2d 143 (4th Cir.1989). Indeed, the Tenth Circuit is the only federal circuit that has expressly embraced the de novo standard of review on *Batson* step one, and even the Tenth Circuit's standard is tempered by a clear-error standard for issues of fact observed by the trial court. *See United States v. Hartsfield,* 976 F.2d 1349, 1355–56 (10th Cir.1992) (reviewing *Batson* step one de novo, but "giving deference to the trial court's first-hand observation of the circumstances of each case").

The seven federal circuits that have rejected the de novo standard of review have expressed similar reasoning, based on the fact-intensive nature of *Batson* step one and on the advantages of allowing the trial court to serve as a fact-finder. For example, in *United States v. Stewart,* 65 F.3d 918, 923 (11th Cir.1995), the Eleventh Circuit Court of Appeals concluded that

a district court's superior ability as a *Batson* factfinder stems from two advantages it has over an appellate court: the posi-

---

**3.** This portion of the opinion has been read as a pronouncement that the standard of review at the second stage of *Batson* is de novo. Although I would not leap to that conclusion, I do not take issue with it here. The second stage of *Batson* is a narrow, circumscribed point in the proceedings. If the trial court finds that the prosecutor's explanation of the challenge at issue is racially motivated, such a determination would be viewed as an ultimate finding of fact—whether it technically occurred at step two or after an opportunity for defense comment. If, on the other

hand, the trial court finds that the explanation is race-neutral, only the statement itself is at issue and an appellate court can read the text of the explanation and revisit the trial court's conclusion. Most probably, in the event that the trial court finds the explanation to be race-neutral, it will proceed to step three and once again reach an ultimate determination, reviewable under the clear error standard. Hence, the standard imposed at stage two is of little consequence in practice.

tional advantage of being there among the facts as they unfold, and of seeing and hearing the explanations as they are given; and the experiential advantage of regularly being in the business of factfinding, which an appellate court is not.

Similarly, the Eighth Circuit Court of Appeals held in *United States v. Moore*, 895 F.2d 484, 486 (8th Cir.1990) that

[t]he trial judge, with his experience in voir dire, is in by far the best position to make the *Batson* prima facie case determination. And, because of his unique awareness of the totality of the circumstances surrounding voir dire, that determination must be treated as a finding of fact entitled to great deference on review. De novo review of the record by this court would be inappropriate because the cold record is simply not enough.

### III.

The Majority seeks guidance from Title VII cases in its determination of the appropriate standard of review for step one of *Batson,* noting that the initial burden on the Title VII plaintiff to raise an inference of illegal discrimination is similar to the prima facie standard under *Batson.* Although it is clear that the two situations are closely analogous, it is unclear that *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), the U.S. Supreme Court case cited by the Majority, requires de novo review under Title VII.

In *Furnco,* the Court distinguished between a factual finding of discrimination, analogous to the third prong of the *Batson* test, and the initial burden of the Title VII plaintiff to come forward with evidence of discrimination sufficient to raise an inference of illegal discrimination. The court of appeals had ruled that once the trier of fact concluded that a "prima facie showing had been made out, statistics of a racially balanced workforce were totally irrelevant to the question of motive." *Furnco Constr. Corp.,* 438 U.S. at 579, 98 S.Ct. 2943; *see also*

*Waters v. Furnco Constr. Corp.,* 551 F.2d 1085 (7th Cir.1977).

The Supreme Court reversed, noting that the scope of the court's inquiry during the prima facie stage is limited: "A ... prima facie showing is not the equivalent of a factual finding of discrimination.... Rather, it is simply proof of actions taken by the employer *from which we infer discriminatory animus ...*." *Furnco Constr. Corp.,* 438 U.S. at 579, 98 S.Ct. 2943 (emphasis added). In other words, once the plaintiff showed that the employer undertook certain types of suspect actions, a rebuttable presumption or "inference" that these actions were the result of discriminatory motive would obtain, and the burden of evidentiary production would shift to the defendant.[4] Because the prima facie stage of a Title VII action requires only such evidence as would be necessary to raise a presumption of discriminatory intent, the trial court's finding at that stage does not represent "the equivalent of a factual finding of discrimination." The Court therefore permitted the defendant to introduce evidence, such as Furnco's workforce statistics, later in the proceeding to rebut the initial presumption of discrimination. Hence, the Court's discussion of inferences was not intended to brand the prima facie stage as a question of law, but rather was incidental to a discussion of when statistical evidence could be properly admitted in the context of a shifting evidentiary burden.

Subsequently, however, the words "we infer discriminatory animus" have been applied to support a de novo standard of review in Title VII cases. The Ninth Circuit, for instance, in a case cited by the Majority, held without further discussion that "[s]ince the Supreme Court has stated that 'a ... prima facie showing is not the equivalent of a factual finding of discrimination,' we are content in this case to apply a de novo standard of review." *Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30,* 694 F.2d 531, 546 (9th Cir.1982) (citation omitted).

Rather than take such an attenuated reading of *Furnco,* I would heed the warning of

---

4. *See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (noting that by establishing a prima facie case, a plaintiff in a Title VII action creates a rebuttable presumption of unlawful discrimination).

the Supreme Court in an earlier discrimination case:

> All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult.... But none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact. Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern "the allocation of burdens and order of presentation of proof," in deciding this ultimate question.

*United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1982) (citation omitted).

Hence, the Title VII precedent does not dissuade me from the conclusion that a clear error standard of review at the prima facie stage of a *Batson* challenge is appropriate.

## IV.

Using the clear error standard, I view the trial court's decision that the defendant had not established a prima facie case to survive scrutiny.

First, I agree with the Majority that the pattern of peremptory strikes in light of the ultimate composition of the jury does not support discriminatory intent. *See* maj. op. at 593–594. Specifically, the final jury consisted of 33% African–American jurors, whereas the venire that was passed for cause only consisted of 26% African–American jurors. One of the three African–American jurors challenged by the prosecutor was replaced by another African–American juror— a fact that the prosecutor knew in advance because of the method of jury selection in use. Hence, the statistical evidence does not support the existence of a prima facie case.

The defendant advances two additional arguments in support of a prima facie showing, neither of which was presented to the trial judge. He points to the similarity in answers on questionnaires filled out by a white juror who was not excused and an African–American juror who was excused. I agree with the Majority that it was incumbent upon the defendant to raise this argument initially in making his *Batson* challenge.

The other argument that the defendant now makes is that the prosecutor's remarks to the jury prior to the commencement of voir dire reveal discriminatory intent. The Majority notes that the remarks were part of the totality of the circumstances to be considered by the trial judge in making a prima facie determination and then holds that the prosecutor's statements, when combined with his pattern of peremptory strikes, establish a prima facie case under *Batson*. Yet, the Majority recognizes that "the prosecutor's opening statements may very well have been an attempt to prevent possible racial bias of the potential members of the jury, rather than an indication of his own racial bias." Maj. op. at 596.

Here, the standard of review adopted by the court plays a major role. The recognition that the opening remarks could be interpreted two different ways acknowledges the critical role of the trial judge. Indeed, under the clear error standard that I would adopt, "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The decision of the lower court will only be overturned if, upon review of the entire record, the reviewing court is "left with the definite and firm conviction that a mistake has been made." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

The statistical make-up of the venire, the number and effect of the challenges, and the ultimate composition of the panel do not add up to a prima facie case. The element that, in the Majority's view, tips the balance to a prima facie case is an element that the Majority acknowledges can be seen two different ways. The trial judge was in the courtroom. She witnessed and heard the voir dire. She concluded that there was no prima facie case.

I find no clear error in that decision.

## V.

Lastly, I am not troubled by the fact that the trial judge proceeded beyond the prima facie stage of the *Batson* analysis even after having found no prima facie case. Indeed, the procedure she used was curious and not optimal. However, the prima facie determination is neither moot[5] nor clouded by the subsequent completion of the record.

It is good practice for the trial judge to articulate the reasons for a finding of no prima facie case on the record with reference to the underlying facts supporting that conclusion. *See Moore*, 895 F.2d at 486. I do not view this trial judge as having done anything more than just that. She supported her own conclusion and then permitted the prosecutor to supplement the record for appellate purposes. She did not, in my view, stray impermissibly into the second or third stages of the *Batson* analysis. She found the showing by the defendant to be inadequate even to shift to the prosecution the burden of coming forward with race-neutral reasons. The record supports that conclusion and I would end the inquiry there.

## VI.

I agree with the reasoning and the result reached by the court of appeals in this case. I therefore respectfully dissent from the Majority opinion.

I am authorized to state that Justice HOBBS and Justice RICE join in this dissent.

---

5. I agree completely with the Majority opinion on this issue. *See* maj. op at section III.