20CA1377 Peo v Vega Gomez 09-05-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 20CA1377
Arapahoe County District Court No. 18CR960
Honorable Darren L. Vahle, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Francisco Vega Gomez,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Yun and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 5, 2024

---

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Lucy H. Deakins, Alternate Defense Counsel, Denver, Colorado for Defendant-
Appellant

¶ 1     Defendant, Francisco Vega Gomez, appeals his convictions of first degree assault, aggravated robbery, two counts of vehicular eluding, three counts of aggravated motor vehicle theft, and conspiracy to commit aggravated motor vehicle theft.  We affirm.

## I.     Background

¶ 2     The trial evidence established that in March 2018, police officers received a report of a stolen white Ford F-350 pickup truck (F-350).  When other officers found the F-350, Sergeant Claude Burns responded to the scene.  Burns began following the F-350 in his marked patrol car.  Burns noticed that a Ford Econoline box truck (box truck) was traveling with the F-350.  The two trucks began driving faster than the posted speed limit and were swerving in and around the lanes without signaling.

¶ 3     A second responding officer, Captain Stephen Redfearn, attempted to stop the box truck.  The box truck began changing lanes, thereby preventing Redfearn from pulling alongside it.  Eventually, Redfearn turned off his emergency lights but continued following the box truck.  Then, the F-350 pulled behind Redfearn at a high speed.  Anticipating that the F-350 was going to hit him, Redfearn swerved onto the shoulder.  Subsequently, the trucks

went separate ways. The box truck continued on the highway, while the F-350 exited. Redfearn followed the F-350 but backed off significantly. After the F-350 arrived at a gas station, Redfearn observed the driver, later identified as Gomez, jump across the gas pump into a different pickup truck, a Ford F-250 (F-250). After struggling with the driver, Gomez took control of the F-250, hit a trailer, and then drove toward the highway. Redfearn followed the F-250, which traveled at over one hundred miles per hour. The Colorado State Patrol deployed spike strips, which caused the F-250 to roll several times. Gomez was ejected from the truck and was identified as its driver.

¶ 4 The prosecution charged Gomez with three counts of first degree assault, aggravated robbery, two counts of vehicular eluding, three counts of aggravated motor vehicle theft, and conspiracy to commit motor vehicle theft. A jury acquitted him of two first degree assault charges and convicted him of the remaining charges. The court sentenced Gomez to sixteen years in the custody of the Department of Corrections.

¶ 5 Gomez challenges his convictions on four grounds, asserting the trial court erred by (1) refusing to allow him to question two of

the prospective jurors; (2) denying his challenge for cause to several prospective jurors; (3) denying his *Batson v. Kentucky*, 476 U.S. 79 (1986), challenge; and (4) permitting the prosecution to impermissibly shift the burden of proof in closing argument. Gomez also alleges that cumulative error in jury selection deprived him of a fair trial. We remanded this case for the trial court to make findings under the three steps articulated in *Batson* and recertified the case on appeal after receiving those findings. Based on the record now before us and the parties' supplemental briefs, we affirm.

## II.    Jury Selection

¶ 6    Gomez alleges three errors in the jury selection process. In addressing each claim separately, we disagree.

### A.    *Batson* Challenge

¶ 7    Gomez first contends that the trial court erred by denying his *Batson* challenge. We disagree.

#### 1.    Additional Facts

¶ 8    On his juror questionnaire, prospective Juror W indicated that he had been convicted of a crime and stated that he had "a lot" of "bad" experiences with police officers. In response to whether there

were any reasons he could not be fair and impartial, Juror W responded, "I don't believe in CO system."

¶ 9     The court asked the jurors whether "[a]nybody ha[d] strong feelings about prosecutors, about criminal defense lawyers, about defendants, one side or the other?"  Juror Wh responded.

> [JUROR WH]: I have extensive experience with the Arapahoe County DA's Office . . . .  So while serving as the Department of Corrections Director for the State of Colorado, I had extensive experience with the Arapahoe County DA's office around death penalty cases as well as other prosecution of inmates at the Colorado Department of Corrections.
>
> [COURT]: Okay.  And so in this case do you feel like you're leaning toward one side or the other?
>
> [JUROR WH]: Well, I believe there's a pattern of the Arapahoe County District Attorney's Office particularly with people of color being excessive in their charges.
>
> [COURT]: All right.  So it sounds like you're leaning against the District Attorney in this case?
>
> [JUROR WH]: Yes, sir.

¶ 10     Next, Juror W addressed the court's question.

> [JUROR W]: Same thing.  I've been in this courthouse myself.  I do feel the same way she just said about the District Attorney as well.

4

[COURT]: Okay.  Did you have a case in this courtroom?

[JUROR W]: I had a couple.

[COURT]: Okay.  Was I the judge on those matters?

[JUROR W]: No.

[COURT]: And I'll let the lawyers ask you some further questions about that.  I appreciate that.

¶ 11     The court then called a bench conference and dismissed Juror Wh for cause.  Later, the court asked Juror W to clarify his comments.

[COURT]: You mentioned that you were charged in a matter.  Was it more than one?

[JUROR W]: Yeah, but I don't want to bring it up.

[COURT]: Okay.  And was that matter handled by a dismissal or by a plea of some kind or by a trial?

[JUROR W]: It was a plea.

[COURT]: Do you feel like you were treated fairly in that matter?

[JUROR W]:  Not at all.

[COURT]: Okay.  How do you feel like that will affect you, if at all, with regard to being fair in this matter?

[JUROR W]: I just don't agree with everything, you know, they say and come forth with.

[COURT]: Okay. One of the great things about our system — and I mentioned this this morning when I talked to the jury — a lot of countries, if a prosecutor or a police officer says you committed a crime, guess what? You committed that crime, and you have to try and prove that you didn't do it.

In our country one of the great things we have is a jury trial, and the jury gets to assess the evidence and decide whether the evidence is sufficient or not.

Do you feel like you would be able to assess the evidence and decide whether they can prove their case? Or are you telling me that you just don't think you could find in favor of the District Attorney?

[JUROR W]: I just feel as if there's probably more information that's not necessarily, you know, told to everybody.

¶ 12    The prosecutor then asked Juror W if his experience with the district attorney's office was weighing on his mind.

[JUROR W]: Of course.

[PROSECUTOR]: Something that maybe you are thinking, [y]ou know, I haven't heard any evidence yet, but the scales are already kind of tilted in the other direction?

[JUROR W]: Yes.

[PROSECUTOR]: Is that a "yes?" Excuse me. Sorry about that. Is that something that you think you're gonna be able to shake during this, or is that something that's going to stay with you?

[JUROR W]: I can try hard as I can, but I've been in his shoes.

[PROSECUTOR]: Is it fair to say, you are already kind of deferring to his side of things?

[JUROR W]: Yes.

[PROSECUTOR]: Understanding that what we are doing here right now is just to see are you the right juror for this type of case? Do you have concerns about your ability to be 100 percent fair and impartial in this case?

[JUROR W]: I'll be fair.

[PROSECUTOR]: You'll be fair?

[JUROR W]: I know when my mind is set.

[PROSECUTOR]: Okay. I want to push back a little bit here. Even though you've already said, you know, that you've kind of had some bad experiences in here, and you are already leaning towards the Defense side of things, you still think you'll be able to be fair?

[JUROR W]: As much as I can.

[PROSECUTOR]: As much as you can?

[JUROR W]: Yes.

[PROSECUTOR]: How are you going to handle that conflict in your head if you are hearing

7

evidence in the courtroom here today, and your personal experience is kind of weighing on your shoulders? How are you going to be able to separate those two?

[JUROR W]: I mean, I still know, you know, what's right is right, wrong is wrong. But I also know that I've been in his shoes so everything's not probably going to be out there for us to see.

[PROSECUTOR]: And I guess the main crux of my question in here then is understanding that you'll only be able to base your decision on the evidence that you hear from that witness stand right there, if you don't hear it from the witness stand or you don't see it in an exhibit, you don't get to consider that. Is that something you'll be able to do?

[JUROR W]: Yes.

¶ 13      Later Juror W expressed skepticism regarding police officers'

credibility:

[PROSECUTOR]: [Juror W], you also had your hand up. Is your past experience maybe clouding how you might view police officers if they came in here?

[JUROR W]: Not just my past experience, other experiences whether it's social media or whatever it may be. I feel like a lot of police officers say what they have to say versus what's the truth, say what they have to say to get the job done or to finish out whatever they already started with. If that makes sense.

[PROSECUTOR]: No. And fair to say social media and even just the news media in general, they put a pretty big spotlight on the actions of police nowadays; is that fair to say?

[JUROR W]: And I don't just look at negative either. I look for positive as well. It's coming from both ends. I feel it's more negative than positive a majority of the time.

[PROSECUTOR]: Now, in this case I know we've already had this discussion, understanding that you have to base your decision based only on what you hear there, if you see a police officer come in, he's got the badge on, maybe he's got a gun on his hip, he's in full uniform; are you kind of getting an emotional response from just seeing a police officer sit down that you are already having concerns one way or another about his credibility?

[JUROR W]: Yeah, I do.

[PROSECUTOR]: And what are those concerns that you're having?

. . . .

[JUROR W]: I guess like I said, saying what he has to say versus the truth.

[PROSECUTOR]: And that's based on —

[JUROR W]: To make his credibility stronger.

[PROSECUTOR]: Stronger, sure. And that's based on your personal experiences as well as everything else that you've heard kind of going on?

9

[JUROR W]: Exactly.

[PROSECUTOR]: And is that something you think you'll be able to set aside, or something that's going to be struck with you?

[JUROR W]: That's stuck.

[PROSECUTOR]: So fair to say if a police officer takes the stand, he's already at a different level than some lay person who might take that stand?

[JUROR W]: Yeah. But like I said, I see everybody for what they say, how they act, of course, but I will have that little bit different.

[PROSECUTOR]: A little bit different?

[JUROR W]: Yeah.

¶ 14    The prosecutor challenged Juror W for cause, stating,

Your Honor, over several different topic areas in speaking with him talking about, you know, credibility of law enforcement officers and then his past experience with the system, he always started out in kind of affirming his belief that he would hold the Prosecution to a higher standard, [t]hat he was critical of the evidence we would put on, [t]hat he knows there's more evidence that he's not going to hear, and that he has a problem with police officers.

Each time I questioned him, it seemed like he was fighting back to try and find a middle point, but kept reaffirming the biases that he would have.

I would note for the Court that in our brief review of our records, we know that [Juror W] is currently on probation in Arapahoe county. He had a case as recent as of January of this year.

So I think that based on his statements on his questionnaire, his statements to the Court, and then his statements to us, understanding his history, that he does rise to a level of excusal for cause.

At this point, I don't believe he could be fair or impartial to the People in this matter.

¶ 15   Defense counsel responded, "Your Honor, I'll agree with the prosecution that [Juror W] had some statements, which there were issues. But when pressed, he would say, Yes, I could be fair. So I object to the challenge for cause."

¶ 16   The court denied the challenge for cause as follows:

All right. And the Court is going to apply the same standard both ways here. We have had jurors who have said essentially they like prosecutors and they like police officers and they trust them. And we've had jurors who said they don't like prosecutors and they don't like police officers and they don't generally trust them. And both of those are opinions which are just fine for jurors to have, and they are not reasons to excuse them for cause.

I understand the People's motion with regard to [Juror W]. He has significant concerns that he has raised, but at the same time, [Juror W] has said he'll judge each person on their own

merits. *And so if the People raise a peremptory challenge, the Court would clearly have a race neutral reason under the Batson rubric whereby that challenge would be unchallengeable,* but — given his statements he's said is he doesn't like police, he doesn't trust them, but he would judge each one as it comes.

So the Court will deny the challenge with regard to [Juror W].

(Emphasis added.)

¶ 17     Subsequently, the prosecutor excused Juror W with a peremptory challenge, and the defense lodged a *Batson* objection arguing,

> Your Honor, [Juror W] is the only African American individual on the panel at this time. I'm asking that the Court reseat him at this time. I believe it's — under Batson, I can ask for the People for a race neutral reason as to why he was being dismissed. I believe it's because he's an African American juror.

¶ 18     The trial court denied the challenge, finding,

> With regard to [Juror W], [he] came very close to disqualifying himself in his statements, and the Court already made a record that there were clearly race neutral reasons to excuse [Juror W] given his statement that he doesn't like officers, he doesn't like the Prosecutor, he doesn't believe them, and thinks that they are essentially — I'm trying to think of how he said it that they essentially will say things

12

> necessary to get the job done whether it's the truth or not.
>
> So the Court does not perceive a racial pattern of any kind. But even if there were shown, the People would simply have to produce a race neutral reason, which there clearly are. So I'll deny a Batson challenge in regard to [Juror W].

¶ 19  The court denied the *Batson* challenge without completing the three-step analysis. Accordingly, the case was remanded for further findings.

¶ 20  At the hearing on remand, the defense reiterated that Juror W was the only African American on the jury and the prosecution had excused Juror W because he was African American. The remand court inquired whether defense counsel had any case law supporting the assertion that simply being African American was sufficient to satisfy the prima facie requirement of step one under *Batson*. Defense counsel responded, "No."

¶ 21  The court then found that Gomez failed to make a prima facie showing that the prosecution's peremptory challenge raised an inference of discriminatory intent. The court stated:

> The law cited here says that as long as the totality of the relevant circumstances raises an

inference of racial motivation, the objecting party has satisfied his or her step one burden.

The trial court considers the totality of the circumstances to include the first juror who was challenged for cause by the People, who my recollection — correct me if I'm wrong — was a white woman. She raised issues about her particular beliefs about the Arapahoe County District Attorney's Office, their racial motivation, that they were harder on African-Americans. She had knowledge about, essentially, racial motivation from the district attorney. That woman was challenged for cause.

The only reason I bring her up is that the voir dire of the challenged juror, Juror W., sort of dovetailed with hers because he referenced her statements and essentially said, I believe the same thing. And then he went on to talk about how he had multiple convictions in Arapahoe County, that he had multiple cases in the very courtroom in which the trial was being heard, and that he would be thinking of other things that were not allowed in evidence, that he knew that there were things that wouldn't come before a jury, and he would be thinking of those things.

So, the totality of the circumstances. And he went on, frankly, in his statement to talk about police officers, how he felt like police officers would say whatever was necessary to get a conviction in court rather than the truth. He would have difficulty believing police officers, that he thought police officers — he generally thinks they were lying to start with, essentially. He made significant comments

prior to the challenge for cause raised by the People.

The Court did a poor job of following the three steps of *Batson*. The Court initially found on the record that I didn't find any racial pattern. And I understand the Court of Appeals' description that a pattern meaning the excusal of more than one juror of a particular race is not necessary in order to find that there is a racial basis for the challenge. What the Court meant to say was that given the totality of the circumstances and all of the statements that were made by Juror W., and specifically the challenge for cause which was raised — which, now reviewing, I think could have been sustained — the Court did not find at the time and does not find there was any way that the Court, looking at the totality of the relevant circumstances — I do not believe that the challenge raised an inference of racial motivation. So the Court finds that step one of the challenge has failed. The Court will deny the *Batson* challenge.

¶ 22     After finding no prima facie case had been established, the court nevertheless addressed steps two and three, in the following colloquy.

[COURT]: So had the court found an inference of racial motivation, what would the People's race-neutral reasons be?

[PROSECUTOR]: Thank you, Your Honor. The People's race-neutral reasons would be that the People had concerns about Juror W's ability to fairly assess the credibility of all

15

witnesses in the case based on his comments about how he would view law enforcement, witnesses, how he viewed the district attorney's office as holding information that he knew we would not present, and how he would potentially be skeptical of all evidence that was put in place because of his experience with the system.

Juror W. was pressed several times about his ability to be fair and impartial, given those beliefs, and he would ultimately acquiesce and say, Well, I know myself, and I know I can be fair. I will be fair here. However, continuously throughout the jury selection process, he would raise additional concerns of hidden evidence, inability to fairly assess the credibility of all witnesses, and inserting his personal experience into his role as a juror. It is for those reasons that the People originally challenged for cause and ultimately exercised a peremptory challenge.

[COURT]: Then, any argument with regard to those allegedly race-neutral reasons that the defense wishes to propound?

. . . .

[DEFENSE COUNSEL]: I mean me, my client, and Juror W. were the only African — are the only minorities in the courtroom, while the only minority in the jury pool, to my recollection was Juror W.

¶ 23    The court found that the prosecution provided race-neutral reasons satisfying step two. It also found that the defense failed to

16

rebut the race-neutral reasons provided by the prosecution. The court reasoned:

> The Court does find that if I'd sustained the challenge at phase one, the People have provided race-neutral reasons. There are no arguments that there are other persons on the jury who were similarly prejudiced and had similar issues raised by Juror W, who were not excused, who were not minorities. Lastly, I'll note that [four of the seated jurors], all appear to have Hispanic surnames or be Hispanic.
>
> So, the Court would not in any circumstance sustain a *Batson* challenge in this case. To me, frankly, this was not even close. So the Court did a poor job of following the three steps, but the Court finds that step one fails, and there's no inference of a racial challenge. Two, the Court finds that there are race-neutral reasons that were given by the People, which are not only plausible, they are demonstrable. And then, three, the Court finds that the defense has failed to show that — let me make sure I get the language correctly. Excuse me, correct. So in step three, defense has the opportunity to rebut the race-neutral reasons, and the Court has to determine whether the objecting party has established purposeful racial discrimination. The Court finds that that has not been established.

### 2. Standard of Review and Controlling Law

¶ 24 The Equal Protection Clause of the Fourteenth Amendment precludes a juror challenge based on race. *Batson,* 476 U.S. at 89.

17

"Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Id.* at 86.

¶ 25　　*Batson* provides a three-step process for evaluating claims of racial discrimination in jury selection. *People v. Johnson*, 2024 CO 35, ¶ 17; *People v. Austin*, 2024 CO 36, ¶ 7. First, the opponent of a peremptory strike must make a prima facie showing that the proponent used the strike against a potential juror because of race. *Johnson*, ¶ 18. As long as the totality of the relevant circumstances raises an inference of racial motivation, the objecting party has satisfied his or her step-one burden. *Batson*, 476 U.S. at 96; *accord Valdez v. People*, 966 P.2d 587, 589 (Colo. 1998). At step two, the proponent of the strike must offer a race-neutral explanation for the strike — an explanation based on something other than the race of the juror. *Johnson*, ¶ 19. Because it is the prosecutor's responsibility to establish a nondiscriminatory purpose, the trial court may not offer up its own plausible reasons for the strike at issue. *People v. Ojeda*, 2022 CO 7, ¶ 29. The striking party may "provide any race-neutral justification for the strike, regardless of implausibility or persuasiveness." *Id.* at ¶ 24. Then, at step three,

18

the opponent may rebut the proponent's explanation, and the court must determine "[w]hether the objecting party has established purposeful [racial] discrimination." *Id.* at ¶ 27. "In assessing the credibility of the proponent of the strike, the court may consider a number of factors, including the proponent's demeanor, how reasonable or improbable the proponent's explanations are, and whether the proffered rationale has some basis in accepted trial strategy." *People v. Collins*, 187 P.3d 1178, 1182 (Colo. App. 2008). For a *Batson* challenge to succeed, the court must "find by a preponderance of the evidence that one or more potential jurors were excluded because of race." *Valdez*, 966 P.2d at 590.

¶ 26    Different steps of the *Batson* analysis are subject to separate standards of review. *Ojeda*, ¶ 30. We review steps one and two de novo. *Id.* At step three, the trial court's final determination as to the existence of racial discrimination is an issue of fact that we review for clear error. *Id.*; *see also Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). We defer to the trial court's step-three ruling "so long as the record reflects that the trial court weighed all of the pertinent circumstances." *Johnson*, ¶ 21 (quoting *People v. Beauvais*, 2017 CO 34, ¶ 2).

### 3. Analysis

¶ 27 We first conclude that any decision that was made at step one is moot because the trial court proceeded to steps two and three. *See People v. Gabler*, 958 P.2d 505, 508 (Colo. App. 1997). Therefore, we decline the prosecution's invitation to decide, as a matter of law, whether a juror's racial identity alone is sufficient to establish a prima facie case of discriminatory intent at step one.

¶ 28 We next conclude that the record demonstrates that the prosecution offered a race-neutral reason for excusing Juror W. The burden at step two is not high; the prosecution need only tender a facially race-neutral explanation. *Valdez*, 966 P.2d at 591. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). The court does not consider whether the explanation is plausible or persuasive. *Johnson*, ¶ 19.

¶ 29 Here, the prosecution challenged Juror W because of concerns about whether he could fairly assess the witnesses' credibility. This reason is supported by the record. Juror W expressed his belief that the Arapahoe County District Attorney's Office was harder on

minorities, that he would have difficulty believing police officers, and that he might consider things that were not allowed into evidence, based on his prior experience with criminal trials. This explanation constitutes a race-neutral reason for exercising a peremptory challenge on Juror W and thus, satisfies the step two requirement.

¶ 30    At step three, the objecting party may rebut the prosecution's race-neutral explanation, and the trial court must decide the ultimate question: Whether the objecting party has established purposeful discrimination? *Ojeda*, ¶27. Gomez argued only that Juror W was the only African American in the jury pool.

¶ 31    We conclude that without more, Gomez has not established purposeful discrimination. As the trial court found, Juror W was treated no differently than Juror Wh, who expressed the same beliefs. And the court noted that there were other minorities on the jury, "who all appear to have Hispanic surnames or be Hispanic." Moreover, the court credited the prosecution's race-neutral reason for challenging Juror W, which is supported by the record.

¶ 32    We conclude that, on remand, the trial court considered all the pertinent circumstances and that its ruling is supported by the

record. *See Johnson*, ¶ 52. Accordingly, we discern no error in the court's decision to deny Gomez's *Batson* challenge.

## B. Challenge for Cause

¶ 33 Gomez next contends that the trial court erred by refusing to allow him to question prospective Jurors Wh and C before the court dismissed them for cause. He also argues that the court erred by denying his challenge for cause to Juror G because the juror expressed "an incorrect view of the burden of proof." We disagree with both contentions.

### 1. Standard of Review and Applicable Law

¶ 34 The United States and Colorado Constitutions both guarantee a defendant the right to a trial by a fair and impartial jury. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16; *People v. Abu-Nantambu-El*, 2019 CO 106, ¶ 14. To protect this right, a district court must sustain a challenge for cause when a juror has indicated "enmity or bias toward the defendant or the state." § 16-10-103(1)(j), C.R.S. 2024; *see also* Crim. P. 24(b)(1)(X). "Actual bias is a state of mind that prevents a juror from deciding the case impartially and without prejudice to a substantial right of one of the parties." *People v. Macrander*, 828 P.2d 234, 238 (Colo. 1992),

22

*overruled on other grounds by People v. Novotny*, 2014 CO 18. The question whether a prospective juror has actual bias "such that [they] cannot judge the matter fairly and impartially is necessarily a matter involving an exercise of discretion on the part of the trial court and therefore a range of permissible judgments about the ability and willingness of that prospective juror." *Vigil v. People*, 2019 CO 105, ¶ 14.

¶ 35 We will overturn a trial court's ruling on a challenge for cause only upon an affirmative showing that the court abused its discretion. *Carrillo v. People*, 974 P.2d 478, 485 (Colo. 1999). A trial court abuses its discretion by removing a prospective juror for cause in the absence of firm and clear evidence that the juror held actual bias that they could not set aside. *People v. Lefebre*, 5 P.3d 295, 302 (Colo. 2000), *overruled on other grounds by Novotny*, 2014 CO 18. This is a "very high standard of review" that accords deference to the trial court's superior ability to assess a potential juror's credibility, demeanor, and sincerity. *People v. Young*, 16 P.3d 821, 824 (Colo. 2001) (quoting *Carrillo*, 974 P.2d at 485-86); *Morrison v. People,* 19 P.3d 668, 672 (Colo. 2000). In determining whether a court has abused its discretion in ruling on a challenge

23

for cause, we must review the entire voir dire of the prospective juror. *Carrillo*, 974 P.2d at 486.

### 2. Juror G

#### a. Additional Facts

¶ 36 During voir dire, defense counsel stated:

> First thing I need to talk to you about is — and I know Judge Vahle kind of went over this briefly —
>
> Now, but one of the things we talked about specifically was that Mr. Vega Gomez and myself, myself and Mr. Vega Gomez, there is no burden on this side of the room. And when Judge Vahle talked to you guys everybody nodded and said, Yeah, completely understand. There's no burden over here.
>
> What I need to know — and I'll start with [Juror N] — when I say "no burden," that means I can sit on this side of the room and do nothing.

¶ 37 A back and forth between defense counsel and several jurors took place before defense counsel first addressed another juror and then Juror G:

> [DEFENSE COUNSEL]: Talk to me about wanting me to put on a case. Talk to me about what you would need from me.
>
> . . . .

I am not here to change your mind. I am not here to convince you that I can sit over here and play Candy Crush. That is not what I'm here for. What I need to know is what you need and what you need from me going forward before we can pick a jury. Now [Juror G]?

[JUROR G]: What do I need from you? If their case is not clear, then I'd like to hear your side of it. If their case if — if you've got another perspective on what they've presented, I want to hear that other perspective. If you don't, then I only need to hear from them and decide based on what they've presented.

[DEFENSE COUNSEL]: Okay. Thank you, [Juror G].

Your — and I don't want to put words in your mouth. So I can understand, they have a perspective, correct?

[JUROR G]: Yes.

[DEFENSE COUNSEL]: And if our perspectives are different, then I should probably do something?

[JUROR G]: Correct.

¶ 38    Defense counsel challenged Juror G for cause, stating, "Your Honor, based on, I believe, [Juror G] indicated [that] she would both need me to put on a defense and to hear from Mr. Vega Gomez. Based on that, obviously shifting the burden to the Defense side, I'm asking that she be excused."

25

¶ 39    The following discussion ensued:

> [PROSECUTOR]: Your Honor, [Juror G] stated that she wanted to hear another perspective on things, but wanting to hear a perspective on other things and not being able to follow the law are two different things.
>
> She did state if she was not given that other perspective, then she would have to base her decision solely on the People's case. So I do believe she is able to follow the law. I don't think she was confronted to the point where she said she would not follow the law.
>
> [COURT]: All right. With regard to the putting on a defense, the record at this point is somewhat muddled. The question was: If I don't put on a defense or who needs me to put on a defense?
>
> We know that to mean that we are going to call witnesses and perhaps call the Defendant. I think the nonlawyers in the room simply mean "do something." And I have tried cases with [defense counsel] and he's not going to do nothing. And so I think that sort of starts the questioning off on a footing that's a bit false because he's not going to do nothing.
>
> With regard to [Juror G] specifically, she said that she'd like to hear from both sides, but that she understands that the law doesn't require it. And if she didn't hear from both sides, she would simply have to assess the credibility of the testimony brought out by the People. So I'll deny as to [Juror G].

26

¶ 40     As well, Juror G indicated on her juror questionnaire that nothing prevented her from being fair and impartial.

### b.     Analysis

¶ 41     Gomez contends that Juror G's responses reflected her belief that Gomez bore a burden in presenting a defense.  Although close, we disagree and conclude that a review of the entire record refutes this contention.  Juror G stated that she would "like" to hear the defense's perspective and that if the defense did not provide a different perspective from the prosecution, then she would "only need to hear from [the prosecution] and decide based on what they've presented."  Thus, Juror G stated if there was no evidence from the defense, she would base her verdict on the prosecution's evidence.  Juror G never expressed an inability to hold the prosecution to the correct burden of proof.  *See Morrison,* 19 P.3d at 674 (statement about hearing both sides provides no basis to conclude juror is unable or unwilling to hold the prosecution to its burden of proof).  Further, Juror G's questionnaire shows that nothing prevented her from being fair and impartial to both sides.

¶ 42     Accordingly, because we conclude the court's findings are supported by the record, it did not abuse its discretion in denying

27

the challenge for cause to Juror G. *See People v. Sandoval*, 733 P.2d 319, 320 (Colo. 1987) (if the trial court is reasonably satisfied that the prospective juror is willing and able to be fair and follow its instruction, the person should not be disqualified).

### 3. Dismissal of Jurors Wh and C

#### a. Additional Facts

¶ 43    As noted above, Juror Wh expressed a bias against the prosecution. Shortly thereafter, Juror C raised his hand and said:

> [JUROR C]: I've been a defendant in a criminal case and in the same civil cases twice so three times. In both cases or all three times, however you want to look at it, I'm aware of the things that aren't allowed to be told to us that gets omitted, and they really would change my mind. So even going through all the evidence, I don't think I can remain — or get beyond a reasonable doubt at the end knowing that there's information I don't have. So I can say probably pretty — I can't stay impartial.
>
> [COURT]: Do you feel like you can be fair in the matter or no?
>
> [JUROR C]: No, I don't.

¶ 44    During a bench conference, the court asked counsel for positions on Juror Wh.

> [PROSECUTOR]: The People would be asking to exclude [Juror Wh] at this time, Your Honor.

28

I think she was pretty clear that her past experiences with the Arapahoe County District Attorney's Office makes her biased against our office, and likely that she would not be able to keep an open mind to evidence presented by the People in this case.

So I would ask to excuse [Juror Wh] at this point.

[DEFENSE COUNSEL]: I'd like to be given the opportunity to talk to her.

[COURT]: I'm going to excuse [Juror Wh], and here's the reason: She seems rather proud of herself given the statement she just made. And as a law enforcement officer, she should know better than to say that in public. And so to me she seems to be trying to poison the jury panel, so I'm going to excuse her before she says another word in open court.

¶ 45    The court then asked about Juror C.

[COURT]: With regard to [Juror C] who says he knows about things that should come into trial that don't, and he couldn't be fair. Any thoughts from either side on that?

[PROSECUTOR]: Your Honor, I would ask to excuse [Juror C], also concerning [to] the People on his questionnaire, he wrote specifically, I will side with the Defendant on this matter.

I think that there were already concerns and that his statements to the jury panel at this point have heightened those concerns. I would be afraid with [Juror C] of any further poisoning of the jury as well.

[DEFENSE COUNSEL]: Your Honor, I think we need further inquiry . . . . I believe I need additional time to speak to [Juror C]. While he did indicate some concerns on his sheet, I don't think he's gotten there with what he stated when the Court questioned him, so I'm going to ask that he be allowed — I be allowed to talk to him [and] the People be allowed to talk to him.

[COURT]: All right. It's very unusual. I will tell you in hundreds of trials that I've conducted, I've never had a panel sort of be this blatant the first time out of the gate, but his statement on Question 12 is: I will side with the Defendant, and then he said he could not be fair because of things he knows don't come in to trial that he thinks should come into trial.

And once again, I'm afraid that he's going to talk more about that if we talk to him. So I'm going to excuse [Juror C].

¶ 46    Later in the bench conference, defense counsel made a further record concerning Juror Wh.

[DEFENSE COUNSEL]: Just to make a record on [Juror Wh]. My understanding of [Juror Wh] was that she was no longer employed by —

[COURT]: I am not excusing her because she's currently a peace officer. I'm excusing her based on her — what I'll call an attempt to poison the jury against the District Attorney.

30

¶ 47    Gomez contends that the trial court's actions were arbitrary and capricious because it failed to apply the same standard to all of the potential jurors in ruling on challenges for cause.  He argues that Jurors Wh and C expressed the same sentiments as Juror W, who was not dismissed for cause and that this evidences the court's application of varying standards.

¶ 48    We disagree because the record shows that Jurors Wh and C explicitly stated they could not be fair.  On his questionnaire, Juror C stated, "I will side with the defendant," and he then confirmed that he could not be fair during questioning.  Similarly, Juror Wh stated that she could not be impartial on her juror questionnaire and then confirmed to the court that she was "leaning against the District Attorney in this case."  And the court expressed its concern that further questioning of these jurors might taint the rest of the panel.

¶ 49    As Gomez concedes, a challenge for cause should be granted when the court is not satisfied that the juror will render an impartial verdict based solely upon the evidence and instructions of the court.  *See Morrison,* 19 P.3d at 672.  The record shows that

Jurors Wh and C were not willing to set aside their personal feelings and decide the case based on the evidence. Conversely, while Juror W agreed with Juror Wh's statements, he stated he could be fair, and he confirmed to the court that he would judge each witness on the merits of their testimony. Thus, the record shows that the court did not apply different standards. Moreover, while a juror may be rehabilitated after expressing preconceived beliefs and serve on the jury, the court has wide discretion in conducting voir dire. *See* Crim. P. 24(a)(3); *People v. Rudnick*, 878 P.2d 16, 21 (Colo. App. 1993) (so long as voir dire is conducted in such a manner that it facilitates an intelligent exercise of challenges for cause and preemptory challenges, a court may reasonably limit the time available in the interest of judicial economy). Because the trial court was in the best position to evaluate the jurors, and because the record supports the court's ruling, we discern no abuse of discretion in its dismissal of Jurors Wh and C without permitting additional questioning. *See People v. Shover*, 217 P.3d 901, 907 (Colo. App. 2009) (we accord great deference to the trial court's handling of challenges for cause because such decisions turn on an

assessment of the juror's credibility, demeanor, and sincerity in explaining their state of mind).

### III.    Cumulative Error in Jury Selection

¶ 50    When reviewing for cumulative error, we ask whether "numerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial." *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (quoting *Oaks v. People*, 371 P.2d 443, 446 (Colo. 1962)).  Because cumulative error requires numerous errors and we have found none, we decline to find cumulative error.

### IV.    Prosecutorial Misconduct

¶ 51    Gomez last contends that the prosecutor shifted the burden of proof during closing argument.  We disagree.

### A.    Additional Facts

¶ 52    During the defense's closing argument, counsel argued:

> I want you to think back to when Joshua
> Teeples came in here and told you how
> terrified he was that Ford truck was bearing
> down on him.  Wait a minute.  Joshua Teeples
> did not come and tell you that.  What you
> heard was that the vehicle that they say Mr.
> Vega Gomez was driving was trying to avoid
> everybody, specifically the vehicle being driven
> by Joshua Teeples.  All right.

33

Well, let's look at Joshua Teeples' dash cam. Okay. Well, we had two officers in a vehicle, and they are saying — one says specifically, He tried to ram us. Well, let's just look at the dash cam. We don't have the dash cam. Well, let's just ask Joshua Teeples. Okay. We don't have Joshua Teeples. Let's just look at his body cam. We don't have the body cam.

Well, Officer Sweeney's here. We'll talk to Officer Sweeney. He'll tell us. What did he tell you? What did he tell you? He was so afraid that this truck — this massive truck was barreling down on him that they turn around immediately and chase this truck down. No, they didn't. No, they didn't. They keep driving. They kept driving.

¶ 53    In rebuttal closing, the prosecutor argued:

With regard to the dash cam and the body cam, [defense counsel] just stood here and asked you, Where is the dash cam from the Aurora Police Department officers? Members of the jury, [defense counsel] knows that the Aurora Police Department does not have dash cams. Colorado State Patrol has dash cams, which is why there was a dash cam from Trooper Sankey that shows the crash after the stop sticks were deployed. The Aurora Police Department has body cams. [Defense counsel] knows that as well.

[Defense counsel] received every second of footage from every body camera associated with this case, and he knows that when a police officer is driving a vehicle, if that body cam is activated, you are looking at the steering wheel the entire time. The body

34

camera doesn't know what's going on in the road in front of the officer. It shows the steering wheel.

Certainly, [defense counsel] had the ability to put any of that footage into this trial that he wanted to. We could have sat here for hours watching body-camera footage of a steering wheel. It doesn't change anything. Body cameras, dash cameras, this evidence is no different in terms of weight than someone swearing to tell the truth sitting next to the judge, looking in your eyes, and telling you what happened.

And unless you think those people are perjuring themselves, just making this up out of whole cloth, you have that evidence in front of you.

¶ 54    Defense counsel did not object.

### B.    Standard of Review and Controlling Law

¶ 55    A reviewing court employs a two-step analysis to allegations of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, it determines whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, it determines whether the conduct warrants reversal according to the proper standard of review. *Id.* Unpreserved claims are reviewed for plain error, and we will only reverse when the error is obvious and so undermined the fundamental fairness of the trial

itself to cast serious doubt on the reliability of the conviction. *Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 56    It is the prosecution's burden to establish the defendant's guilt, and the prosecution may not shift that burden to the defendant by arguing that the defendant must prove his innocence. *People v. Santana*, 255 P.3d 1126, 1130 (Colo. 2011).  In assessing allegations of burden shifting, we consider whether (1) the prosecutor specifically argued or intended to establish that the defendant carried the burden of proof; (2) the prosecutor's actions constituted a fair response to the questioning and comments of defense counsel; and (3) the jury is informed by counsel and the court about the defendant's presumption of innocence and the prosecution's burden of proof.  *Id.* at 1131-32.

### C.    Analysis

¶ 57    The prosecution did not shift or lower the burden of proof in this case for four reasons.  First, the prosecutor "never explicitly argued that the defendant [had] the burden of proof." *Id.* at 1133. Second, the prosecutor's argument constituted a fair response to defense counsel's arguments and explained why the video argued by defense counsel did not exist and would not be helpful.  *See id.*

Third, the written jury instructions, including the burden of proof and the elemental instructions, properly informed the jury of the prosecution's burden of proof. In the absence of contrary evidence, we presume that the jury understood and followed the trial court's instructions. *Id.* at 1132-33. Finally, the argument elicited no objection from defense counsel, indicating that it was not glaringly improper. *See Domingo-Gomez v. People*, 125 P.3d 1043, 1054 (Colo. 2005) (defense counsel's failure to make a contemporaneous objection to the prosecutor's remarks evidences that he perceived no obvious prejudice).

¶ 58     Accordingly, we discern no error.

## V.     Disposition

¶ 59     The judgment is affirmed.

JUDGE YUN and JUDGE KUHN concur.