23CA1314 Peo v Herrington 06-12-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1314
El Paso County District Court No. 21CR4809
Honorable Chad Miller, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jacob Herrington,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE GROVE
Welling and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 12, 2025

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John P. Finnegan, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 Defendant, Jacob Herrington, appeals the judgment of conviction entered after a jury found him guilty of obstructing a peace officer. We affirm.

## I. Background

¶ 2 The prosecution charged Herrington based on his conduct surrounding an August 2021 incident at an El Paso County gas station. Following an altercation with another individual outside the gas station, Herrington entered the establishment and began yelling. An employee called the police, and Herrington exited the gas station at the behest of a customer.

¶ 3 Officers arrived to find Herrington in the parking lot with "a knife sheath on his side," describing him during later testimony as "loud," "yelling," "erratic," "making a lot of nonsensical statements," "belligerent," "[a]gitated, upset, yelling, cursing, just causing a scene," and "[e]xtremely loud." Herrington initially complied with officers' directives, and they detained him. But after being handcuffed, Herrington refused to identify himself and balled up his fingers as officers attempted to scan them with a fingerprint reader. Herrington indicated his desire to remain silent as he lay limply on the ground and rolled over in response to officers' attempts to

1

restrain him.  Officers transported Herrington to jail to identify him, where he continued to resist being restrained and allegedly spat in an officer's face.

¶ 4　　Herrington went to trial on the following charges: (1) second degree assault (based on the spitting allegation); (2) obstructing a peace officer; and (3) disorderly conduct.  A jury found Herrington guilty of the obstruction charge only.

## II.　Suppression

¶ 5　　Herrington contends that the district court reversibly erred by not suppressing "evidence obtained after [his] arrest" on the basis that officers lacked probable cause to arrest him for disorderly conduct.  Specifically, he argues, probable cause was absent because no evidence established that his yelling while at the gas station was not constitutionally protected speech.  According to Herrington, the "evidence of [his] alleged obstruction flowed directly from his actions after he was placed under arrest without probable cause," and, therefore, this evidence should have been suppressed.

¶ 6　　The parties dispute preservation of this issue.  Yet even if we assume Herrington's argument on appeal was preserved, and even if we assume that Herrington is correct that his arrest lacked

probable cause, his suppression argument is unavailing because the evidence that Herrington obstructed a peace officer still would have been admissible.

¶ 7    In *People v. Doke*, 171 P.3d 237 (Colo. 2007), our supreme court explained that evidence of a defendant's criminal conduct is admissible even if that conduct occurred in response to an illegal search or seizure.  Specifically, a person whose Fourth Amendment rights are violated by an officer may not respond by committing a new crime "and then rely on the exclusionary rule to suppress evidence pertaining to that criminal act."  *Id.* at 239; *see also People v. Smith*, 870 P.2d 617, 619 (Colo. App. 1994) ("[I]f, following an illegal stop or attempted stop, the detained person's response is itself a new, distinct crime, then the police constitutionally may arrest the person for that crime and the evidentiary fruit of that arrest will not be suppressed.").  A new criminal act "breaks the causal connection between the police illegality and the evidence of the new crime so that sufficient attenuation occurs to treat evidence of the new crime as admissible, and therefore the evidence should not be suppressed under the derivative evidence rule."  *Doke*, 171 P.3d at 240.  "Evidence is not necessarily excluded 'simply because

it would not have come to light but for the illegal action of the police.'" *Id.* (quoting *People v. Lewis*, 975 P.2d 160, 170 (Colo. 1999)).

¶ 8      Moreover, the obstruction statute itself states that "[i]t is not a defense to a prosecution under this section that the peace officer was acting in an illegal manner, if he or she was acting under color of his or her official authority." § 18-8-104(2), C.R.S. 2024.

¶ 9      Thus, even if Herrington's arrest for disorderly conduct was an illegal seizure, evidence of Herrington's obstruction of a peace officer following that arrest was still admissible and the district court did not err in refusing to suppress it.[1]

---

[1] In supplemental briefing that we ordered and the parties submitted after oral argument, Herrington urges us to interpret the rule outlined in *People v. Doke*, 171 P.3d 237 (Colo. 2007), as applying only to violent offenses. We decline to do so. Nothing in *Doke* suggests such a limitation on the holding in that case. *See People v. Tomaske*, 2019 CO 35, ¶ 18 (holding that the exclusionary rule does not apply where police misconduct led to the commission of a "new crime"); *see also People in Interest of K.D.W.*, 2020 COA 110, ¶ 29 ("[T]he search of K.D.W.'s pockets was attenuated from the illegal seizure because K.D.W.'s independent and willful criminal actions of trespass and obstructing a peace officer broke the causal chain between the police officers' misconduct and their discovery of the evidence of K.D.W.'s criminal conduct.").

### III.  *Arguello* Advisement

¶ 10    Herrington contends that the district court violated his right to represent himself.  Specifically, Herrington asserts structural error due to the district court's refusal to provide an *Arguello* advisement. *See People v. Arguello*, 772 P.2d 87 (Colo. 1989).  We disagree.

### A.    Additional Facts

¶ 11    After Herrington's arrest, the court appointed a public defender to represent him.  During his arraignment, Herrington made the first of what would become several requests to represent himself.  The court postponed discussing his request until Herrington first had a chance to meet with his counsel to discuss the matter.  Soon afterward, Herrington began submitting pro se motions while counsel continued to represent him.  Defense counsel then raised the issue of Herrington's competency, and the court delayed addressing the self-representation matter until that issue was resolved.

¶ 12    An evaluator opined that Herrington was incompetent, and Herrington began the process of restoration.  After two months of restoration treatment, Herrington received another evaluation; this time the evaluator opined that Herrington was competent.

¶ 13    At Herrington's next court appearance, the court, Herrington,

and defense counsel had the following colloquy:

> [HERRINGTON]: I'm wanting to withdraw the Public Defenders.
>
> THE COURT: Okay. Well, sir, you're not able to do that unless there's a conflict. Are you suggesting there's a conflict with the Public Defender's Office? Because I can hold a Conflict Hearing if you believe that to be the case.
>
> [HERRINGTON]: Well, that and now that I'm deemed competent, I should be able to exercise my right of representing myself.
>
> THE COURT: Okay. And, I've reviewed some of the motions that you've filed, which indicate to me that you're not capable of representing yourself. But we can have a hearing on that as well, if you'd like. We can proceed with that discussion, at this time . . .
>
> [HERRINGTON]: Well, yeah.
>
> THE COURT: . . . but I'm not going to let you represent yourself if you're not capable of doing so.
>
> [HERRINGTON]: I don't know why I'm not able to.
>
> THE COURT: Well, then we can talk about that. Let's -- I think we have to talk about that first. Well, either way I'm going to reset the cases for trial and Prelim. So, I guess we can get new dates first and then talk about . . . .

> [DEFENSE COUNSEL]: Does the Court want to have a Conflict Hearing first and then discuss?
>
> [HERRINGTON]: I've been told by my Public Defender, you too, that the victims of the crime -- that they were not going to gather any evidence whatsoever that had a double potential of assisting me in further litigations in civil matters.
>
> THE COURT: Okay. Well, hang on. That sounds like he's raising a potential conflict issue. Sir, we'll hear that, but a conflict issue's heard outside the presence of the District Attorney so that it can't hurt your case. So, I want you to hold on a second. That sounds like a request for a Conflict Hearing. [Prosecutor], I'm going to ask you to leave the courtroom.

¶ 14    The court then held a conflict hearing, during which it concluded that no conflict existed.

¶ 15    Immediately after the conflict hearing, as the court was about to provide Herrington an *Arguello* advisement and assess his request to represent himself, Herrington's counsel again raised the issue of competency "[b]ased on some of the things that were said in the conflict hearing." Noting that it "ha[d] concerns, as well" about Herrington's competency based on "things being said that just don't make sense," the court explained that "it [was] too early for an

7

*Arguello* advisement if the finding of competence is being challenged" and that it "[could not] get to the issue of self-representation today." The court informed Herrington that he could "re-raise that issue after we have the new evaluation resolved. Once I have a second evaluation, if it reaches the same conclusion, Mr. Herrington, then we can move forward with your request to represent yourself, at that time if you are still asking to."

¶ 16 The following month, the court held a second conflict hearing at the request of Herrington's counsel, during which it found Herrington had a conflict with his public defender and appointed alternate defense counsel. Several weeks later, the competency evaluator opined that Herrington was competent, and the court subsequently found Herrington competent to proceed. Herrington did not renew his request to represent himself, and alternate defense counsel represented him at the trial.

### B. Relevant Law and Standard of Review

¶ 17 A criminal defendant has a fundamental constitutional right to counsel and a correlative right to self-representation. *See id.* at 92.

¶ 18 A trial court has a duty to ensure that any waiver by a defendant of the right to counsel is voluntary, knowing, and

intelligent.  *Id.* at 94.  Among other things, this duty requires the court to ensure that the defendant is aware of the dangers and disadvantages of self-representation.  *Id.* at 95.  To facilitate this analysis, our supreme court has suggested a specific set of questions that the court should ask before allowing a defendant to waive the right to counsel.  *Id.* at 98.  Ultimately, a defendant must validly waive the constitutional right to counsel to exercise the right to self-representation.  *People v. Davis*, 2015 CO 36M, ¶ 15.  A defendant validly waives the right to counsel if he (1) is competent to waive the right, and (2) makes the waiver voluntarily, knowingly, and intelligently.  *Id.*  Whether a defendant has waived the right to counsel presents a mixed question of law and fact that we review de novo.  *People v. Alengi,* 148 P.3d 154, 159 (Colo. 2006).

¶ 19     Due process and Colorado statutes "prohibit trying or sentencing a defendant who is incompetent to proceed."  *People v. Zimmer,* 2021 COA 40, ¶ 17.  A defendant is incompetent to proceed if,

> as a result of a mental disability or developmental disability, the defendant does not have sufficient present ability to consult with the defendant's lawyer with a reasonable degree of rational understanding in order to

9

> assist in the defense, or . . . , as a result of a mental disability or developmental disability, the defendant does not have a rational and factual understanding of the criminal proceedings.

§ 16-8.5-101(12), C.R.S. 2024.

¶ 20    When either party or the court raises the question of a defendant's competency, "the court may make a preliminary finding of competency or incompetency to proceed, which is a final determination unless a party to the case objects within seven days after the court's preliminary finding." § 16-8.5-103(1)(a), C.R.S. 2024. "If either party objects to the court's preliminary finding, or if the court determines that it has insufficient information to make a preliminary finding, the court shall order that the defendant be evaluated for competency by the department and that the department prepare a court-ordered report." § 16-8.5-103(2). Following receipt of that report, "[i]f neither party requests a hearing or a second evaluation within the applicable time frame, the court shall enter a final determination, based on the information then available to the court, whether the defendant is or is not competent to proceed." § 16-8.5-103(5).

## C. Analysis

¶ 21     Herrington requested to represent himself several times before trial. However, he did not make any of those requests at a time during which he could have validly waived his right to counsel. He made his initial request during his arraignment and prior to discussing the matter with his counsel, leading the court to postpone providing an *Arguello* advisement until after the two conferred.[2] Shortly thereafter, an evaluator opined that Herrington was incompetent, preventing the court from considering the issue further at that time. After restoration and a new evaluation opining that Herrington was competent (but before the court accepted the results of that evaluation and deemed Herrington competent), Herrington raised both a conflict issue and made another request to represent himself. The court addressed the conflict issue first, and during the conflict hearing Herrington made statements that again called his competency into question. Accordingly, the court postponed providing an *Arguello* advisement, explaining to

---

[2] Because Herrington does not contend that the district court erred in its approach to his request during his arraignment to represent himself, we express no opinion on the matter.

Herrington that they could revisit the issue if he wished once the court deemed him competent. After the court appointed alternate defense counsel and made a final determination that Herrington was competent, Herrington made no further request to represent himself.

¶ 22    Because a defendant must be competent to validly waive the right to counsel, *Davis*, ¶ 15, there was no reason for the district court to provide Herrington an *Arguello* advisement until his competency was established. Put another way, Herrington had to be competent in order to waive his right to counsel, so the district court had no obligation to advise him further while his competency remained in doubt. And every instance of Herrington requesting to waive counsel that is before us occurred while his competency was in question. Thus, without having first established Herrington's competency, any waiver of his right to counsel would have been invalid irrespective of his responses to an *Arguello* advisement.

IV.    *Batson* Challenge

¶ 23    Herrington next alleges that the district court erroneously denied his challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79

(1986), to the prosecution's peremptory strike of a Hispanic juror. We are not persuaded.

## A. Additional Facts

¶ 24    Juror 15, whose removal prompted Herrington's *Batson* challenge, was one of two individuals[3] in the forty-person venire to identify as "Hispanic" in response to a juror questionnaire prompt that read: "I consider myself to be a member of the following racial/ethnic/minority group."  In response to another question from the questionnaire about whether the juror had "had a particularly good or bad experience with law enforcement," Juror 15 wrote: "Good, I Guess Not Particularly Negative or Positive."  Juror 15 also noted in his questionnaire that he had "had 2 cousins killed unrightfully By Police in the Last 10 yrs," and that he did not think he could be fair in a case involving a police shooting.  In response to questions from the prosecution regarding these incidents, Juror 15 stated that he could be unbiased when assessing the case but that his cousins' deaths were "somewhat traumatizing" to him and that

---

[3] The second individual was never called to the jury box and so was neither struck nor empaneled.

"the thought of someone, let alone a family member, being injured or possibly killed by police is very troubling to [him]."

¶ 25     The prosecution used a peremptory strike to remove Juror 15. Defense counsel objected to the strike under *Batson* and the following discussion occurred:

> [Defense counsel]: Your Honor, I believe the People have used their peremptory on the only Hispanic juror in the panel.
>
> THE COURT: I don't think that's true, but go ahead and give me your reason. Prima facie case from defense this is based on race.
>
> [Defense counsel]: [Juror 15] answers on questionnaire indicated he could be fair. I don't see any reason.
>
> THE COURT: Well, recent case law made it very clear I can't give the reason. So I will let you all give the reason.
>
> [Prosecutor 1]: Your Honor, the People are excusing this juror because he talked about two of his cousins being killed by law enforcement. And I think that will taint his assessment of the case.
>
> THE COURT: So first off, for purposes of [*Batson*], I don't necessarily find that the first prong is met just by stating that this juror is a minority. That said, to the extent that the Appellate Court disagrees, I find that it was met. The People have stated a reason, a race neutral reason, which, again, I don't think they

14

needed to under the circumstances. So I'm going to grant it.

[Prosecutor 2]: Just for the record, it was a bad experience, was traumatizing to him. I wanted to state that.

THE COURT: I agree.

¶ 26 Meanwhile, Juror 20, whom the parties describe on appeal as having "a Spanish surname" and "a Hispanic surname," did not identify herself in her questionnaire as belonging to any "racial/ethnic/minority group." She wrote that she did not "feel like [she] could decide[] anything for anyone," that she was "very bias[ed] with everything," and that she did not "get along with some race[s]." Juror 20 also wrote that she is "a person who doesn't like anything to do with crime or any type of cases" and "tend[s] to have a lot of anxiety with situation[s] like this." In response to questioning from the prosecution, however, she stated that she did not think her biases would affect her ability to serve impartially on the jury. The prosecution also used a peremptory strike on Juror 20, to which defense counsel did not object.

¶ 27 Juror 23, whom neither party describes as having "a Spanish surname" or "a Hispanic surname," did not identify herself in her

15

questionnaire as belonging to any "racial/ethnic/minority group." She did, however, note in her questionnaire that she had a "[b]ad" experience with law enforcement when she was 15 years of age (her questionnaire indicated that she was 63 years of age at the time she filled it out), which she described as an attorney leading her as a witness in a manner that was "quite unkind." When the prosecution questioned Juror 23 about this event, she explained that it occurred in traffic court when a friend faced a traffic violation, but that she could "put that behind [her] as a — you know, a young experience." The prosecution did not attempt to strike Juror 23, and she ultimately sat on the jury

### B. Relevant Law and Standard of Review

¶ 28 The Equal Protection Clause of the Fourteenth Amendment forbids a challenge to a potential juror based solely on race. *Batson*, 476 U.S. at 89; *see also People v. Wilson*, 2015 CO 54M, ¶ 10 n.4. When a party raises a *Batson* challenge, the trial court engages in a three-step analysis to assess the claim of racial discrimination. *Wilson*, ¶ 10.

¶ 29 First, the opponent of the peremptory strike must allege a prima facie case showing that the striking party excused the

16

potential juror based on race. *Id.* As long as the totality of the relevant circumstances raises an inference of racial motivation, the objecting party has satisfied the step-one burden. *Batson*, 476 U.S. at 96; *accord Valdez v. People*, 966 P.2d 587, 589 (Colo. 1998).

¶ 30 Second, the burden shifts to the striking party to provide a race-neutral explanation for excusing the potential juror. *Wilson,* ¶ 10. The striking party need only provide any race-neutral justification for the strike, regardless of implausibility or persuasiveness. *People v. Ojeda,* 2022 CO 7, ¶ 24. The opponent is then given the opportunity to rebut the striking party's explanation. *Wilson,* ¶ 10.

¶ 31 Third, the trial court must decide the ultimate question: whether the objecting party has established purposeful discrimination. *Ojeda,* ¶ 27. In doing so, the court must assess the striking party's actual subjective intent and the plausibility of its nondiscriminatory explanation. *Id.*; *Wilson,* ¶ 10.

¶ 32 The standard of review for a *Batson* challenge depends on which step of the analysis is challenged on appeal. *People v. Friend,* 2014 COA 123M, ¶ 8, *aff'd in part and rev'd in part,* 2018 CO 90. We review steps one and two de novo. *People v. Rodriguez,* 2015 CO

55, ¶ 13. The court's ruling at step three, however, is a factual finding to which "an appellate court should defer, reviewing only for clear error." *Id.*; *see also People v. Beauvais*, 2017 CO 34, ¶ 32. We accord the trial court's ruling "great deference and will only reverse under 'exceptional circumstances.'" *Beauvais*, ¶ 25 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)).

## C. Analysis

¶ 33 Applying the principles outlined above to these facts, we conclude that the district court did not clearly err by finding that Herrington failed to prove that the peremptory challenge to Juror 15 was based on race.

¶ 34 The People argue that Herrington "failed to make a prima facie showing of discriminatory purpose" at *Batson* step one. However, where a trial court proceeds, as it did here, to analyze a *Batson* challenge under steps two and three, the preliminary issue of whether the defendant made a prima facie showing is moot. *See Valdez*, 966 P.2d at 592; *People v. Cerrone*, 854 P.2d 178, 186 n.13 (Colo. 1993).

¶ 35 Herrington, meanwhile, does not challenge the court's conclusion that the prosecution carried its burden at step two of

18

the *Batson* framework by providing a facially race-neutral reason for striking Juror 15.[4]

¶ 36    Turning to step three of the *Batson* analysis, Herrington contends that the prosecution's race-neutral explanation for exercising the peremptory strike of Juror 15 was pretextual because (1) there was a "pattern of strikes exercised against Hispanic and Spanish-surnamed jurors," and (2) the prosecution did not strike Juror 23, who was "a similar but non-Hispanic juror."

¶ 37    With respect to Herrington's first contention, he attempts on appeal to portray a pattern of racially motivated strikes by discussing multiple jurors, half of whom are irrelevant to the *Batson* analysis. Herrington's opening brief focuses on two jurors who "explicitly identified as 'Hispanic,'" and two jurors who "had Spanish surnames," emphasizing that "[n]one of them served on the

---

[4] Herrington appears to suggest that the district court did not provide defense counsel adequate opportunity to rebut the prosecution's proffered race-neutral explanation, but he does not develop this argument. In any event, defense counsel preemptively argued to the court that Juror 15's questionnaire answers "indicated he could be fair" and that defense counsel did not see any reason for the strike before the prosecution provided a race-neutral reason. After that point, defense counsel made no effort to rebut the prosecution's explanation.

jury." That may well be true, but Herrington ignores the fact that only two of those jurors are at all relevant to the *Batson* analysis: (1) Juror 15, who identified as "Hispanic" in his questionnaire and was removed with a peremptory strike; and (2) Juror 20, whom Herrington describes as having "a Spanish surname" but who did not identify herself in her questionnaire as belonging to any "racial/ethnic/minority group," and who was removed with a peremptory strike to which defense counsel did not object. Juror 7, whom Herrington describes as "a woman with a Spanish surname," was struck for cause. But because *Batson* applies only to a prosecutor's peremptory strike of a potential juror, *see Wilson*, ¶ 10, and not a prosecutor's challenge for cause, Juror 7 is irrelevant to this analysis. And Juror 36, who identified as "Hispanic/latina" in her questionnaire, was too far down the list of potential jurors to be seated or struck.

¶ 38     The pattern of racially motivated strikes that Herrington alleges thus amounts to the peremptory strikes against Juror 15 and Juror 20. These two peremptory strikes alone fail to demonstrate the pattern Herrington alleges. Evidence of that pattern is even weaker given that Juror 20 did not identify as

20

belonging to any "racial/ethnic/minority group" and defense counsel did not object to her peremptory strike at trial. Moreover, after defense counsel challenged Juror 15's removal, the prosecution explained its concerns that Juror 15's cousins' deaths at the hands of law enforcement were "a bad experience" that "was traumatizing to him" and would "taint his assessment of the case." These reasons were race-neutral on their face. When deferring substantially, as we must, to the court's findings of fact, we agree that there was sufficient record evidence to conclude that defense counsel failed to establish purposeful discrimination in light of the prosecution's proffered race-neutral explanation.

¶ 39 We are likewise unpersuaded by Herrington's related contention that the prosecution's decision not to use a peremptory strike against Juror 23, who he describes as "a similar but non-Hispanic juror," revealed purposeful discrimination against Juror 15. Herrington argues that because Juror 15 and Juror 23 both "described bad experiences with law enforcement" that "happened a substantial time ago," and both indicated that they could put those experiences aside and be fair jurors, the prosecution's decision to strike Juror 15 but permit Juror 23 to sit

on the panel revealed racial discrimination. Herrington's comparison of these jurors on appeal, however, ignores important differences among the experiences that they described. Juror 15 discussed the killing of two of his cousins during the previous ten years at the hands of police, which he described as "somewhat traumatizing." He stated that "the thought of someone, let alone a family member, being injured or possibly killed by police is very troubling to [him]." Juror 23, meanwhile, discussed an unpleasant experience she had answering "unkind" questions from an attorney when she appeared as a witness in traffic court forty-eight years beforehand. The experiences of these two jurors are meaningfully different not only in type but also in temporal proximity.

¶ 40    Our supreme court has instructed that "an appellate court conducting a clear error review should defer to a trial court's ultimate *Batson* ruling so long as the record reflects that the trial court weighed all of the pertinent circumstances and supports the court's conclusion as to whether the objecting party proved purposeful discrimination by a preponderance of the evidence." *Beauvais*, ¶ 63. Here, the prosecution provided a race-neutral reason for exercising the peremptory strike against Juror 15, and

22

the court found, based on its firsthand observation of the entire voir dire (including the information provided by other members of the venire), that the strike was not the result of purposeful discrimination. Because the court's findings are supported by the record and are based on its consideration of all the pertinent circumstances, we discern no error.

## V.  Jury Instructions

¶ 41    Lastly, Herrington contends that the jury instruction reciting the elements of obstructing a peace officer under section 18-8-104(1)(a), amounted to plain error because it did not include language from another subsection of the same statute. We are not persuaded.

### A.  Relevant Law and Standard of Review

¶ 42    Trial courts have a duty to correctly instruct juries on all matters of law. *Castillo v. People*, 2018 CO 62, ¶ 34. We review jury instructions de novo to determine whether they accurately informed the jury of the law. *People v. Trujillo*, 2018 COA 12, ¶ 11.

¶ 43    Where, as here, the defendant did not object to the challenged instruction, we review for plain error. *See Hagos v. People*, 2012 CO 63, ¶ 14. Plain error exists where an error is (1) obvious and

(2) substantial. *Id.* An error is obvious when it "contravene[s] a clear statutory command, a well-settled legal principle, or established Colorado case law." *People v. Crabtree*, 2024 CO 40M, ¶ 42. An error is substantial when it "so undermine[s] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Hoggard v. People*, 2020 CO 54, ¶ 13 (quoting *People v. Weinreich*, 119 P.3d 1073, 1078 (Colo. 2005)). "[W]ith respect to jury instructions, reversal under a plain error standard requires a defendant to 'demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to his conviction.'" *People v. Garcia*, 28 P.3d 340, 344 (Colo. 2001) (citation omitted).

¶ 44    Instructions that track the language of applicable statutes and pattern instructions are generally sufficient. *People v. Jackson*, 2018 COA 79, ¶ 64, *aff'd*, 2020 CO 75; *see also Weinreich*, 119 P.3d at 1076 ("A jury instruction should substantially track the language of the statute describing the crime . . . ."). And "an erroneous jury instruction does not normally constitute plain error where the issue is not contested at trial or where the record contains overwhelming

24

evidence of the defendant's guilt." *People v. Miller,* 113 P.3d 743, 750 (Colo. 2005).

¶ 45    The obstruction statute under which Herrington was charged states in relevant part that

> [a] person commits obstructing a peace officer . . . when, by using or threatening to use violence, force, physical interference, or an obstacle, such person knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority . . . .

§ 18-8-104(1)(a).

¶ 46    The language from the subsection that Herrington argues should have been included in the jury instructions states that "[a] person shall not be charged with the offense described in subsection (1) of this section because the person remained silent or because the person stated a verbal opposition to an order by a government official." § 18-8-104(1.5).

## B.    Analysis

¶ 47    The elemental instruction for the obstruction charge tracked both the obstruction statute and the pattern jury instructions. *See* § 18-8-104(1)(a); COLJI-Crim. 8-1:05 (2024). Nonetheless,

Herrington contends that police testimony and argument by the prosecution suggested to the jury that Herrington was charged with obstruction because he refused to identify himself and because he yelled. These bases, he argues, would be insufficient to convict him under the obstruction statute, so the district court should have also instructed the jury that an individual cannot be charged with obstructing a peace officer for remaining silent or verbally opposing an order by a government official. The absence of that additional instruction, according to Herrington, "allowed [him] to be convicted on an insufficient legal theory."

¶ 48    An error is obvious when it "contravene[s] a clear statutory command, a well-settled legal principle, or established Colorado case law." *Crabtree*, ¶ 42. As evidence of the obviousness of the error he alleges, Herrington points only to the statutory language of section 18-8-104(1.5) that prohibits charging an individual with obstruction for remaining silent or verbally opposing an order by a government official. However, the mere existence of a statute clarifying that an individual may not be charged under the obstruction statute for that specific conduct is insufficient to show that the court's instructions violated "a clear statutory command."

26

*Crabtree*, ¶ 42. This is especially so when those instructions specified that the prosecution had to prove each element of obstruction beyond a reasonable doubt, including that Herrington "us[ed] or threaten[ed] to use violence, force, physical interference, or an obstacle." In light of those instructions, informing the jury that Herrington could not have been charged at the outset with obstruction simply for remaining silent or verbally opposing an order by a government official would have added nothing to the jury's understanding of what the prosecution was required to prove in order to secure a conviction.

¶ 49 For the same reason, the court's jury instructions could not have created a substantial error that "so undermine[d] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction," *Hoggard*, ¶ 13, or that "reveal[ed] a reasonable possibility that the error contributed to [Herrington's] conviction," *Garcia*, 28 P.3d at 344.

¶ 50 Moreover, the record contains overwhelming evidence that Herrington used force in his encounter with the police. For example, the officers who arrested Herrington testified that, after Herrington refused to identify himself and officers resorted to

attempting to learn his identity through the use of a fingerprint reader, Herrington "balled up his fists" and "refused to un-ball his fingers so that [officers] could not get a print from his fingers." Those same officers also testified that Herrington physically resisted efforts to restrain and transport him, both in the gas station parking lot and at the jail.

¶ 51 Accordingly, we conclude that the district court's omission of section 18-8-104(1.5)'s language from the jury instructions on the elements of the charge for obstructing a peace officer was not plain error.

## VI. Disposition

¶ 52 The judgment is affirmed.

JUDGE WELLING and JUDGE JOHNSON concur.

28